**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| Ashley II of Charleston, L.L.C., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.: 2:05-2782-CWH |
| | ) | |
| vs. | ) | |
| | ) | |
| PCS Nitrogen, Inc., | ) | **FINDINGS OF FACT AND** |
| | ) | **CONCLUSIONS OF LAW** |
| | ) | |
| Defendant/Third Party Plaintiff, | ) | |
| | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| James H. Holcombe and J. HenryFair, Jr., | ) | |
| | ) | |
| Third Party Defendant. | ) | |
| _____ | ) | |

**FINDINGS OF FACT & CONCLUSIONS OF LAW**

On September 26, 2005, the plaintiff Ashley II of Charleston, LLC ( "Ashley II") filed a complaint alleging that the defendant is a potentially responsible party for the release of a hazardous substance on approximately 27 acres of the upper peninsula of Charleston ("the Site") now owned by Ashley II.  The plaintiff brings this action pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), as amended 42 U.S.C. §§ 9601, *et. seq*.  Accordingly, the Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331.

On July 25, 2006, this Court bifurcated this action to first determine whether the defendant is the successor to Columbia Nitrogen Corporation ("old CNC"), the owner and

operator of the Site at the time of the release.  The parties agree that a contract called the

Acquisition Agreement determines whether PCS is the successor to old CNC.  On February 20,

21, and 22, 2007, the issue of successor liability was tried before the Court without the benefit of

a jury.  After hearing the testimony, gauging the credibility of the witnesses, and reviewing the

exhibits, the evidence presented, and the briefs submitted by the parties, the Court, pursuant to

Rule 52 of the Federal Rules of Civil Procedure, makes the following Findings of Fact and

Conclusions of Law:

<u>**FINDINGS OF FACT**</u>

**History of the Site**

    **1.**  On June 30, 1966, old CNC purchased the Site from Ross Development Corporation,

formerly known as Planters Fertilizer and Phosphate Company.

    **2.**  Between 1966 and 1972, old CNC owned the Site and operated a fertilizer granulation

plant thereon.  Old CNC produced superphosphate and N-P-K fertilizer (nitrogen-phosphate-

potassium fertilizer).  One fertilizer produced by old CNC at the Site was a 14-0-14 fertilizer,

containing nitrogen and potassium in equal strengths and containing no phosphate.

    **3.**  In 1972, old CNC ceased fertilizer production at the Site.

    **4.**  In 1980, all buildings on the Site were demolished.

    **5.**  On February 7, 1985, old CNC conveyed the Site to Susan M. Smythe, as counsel to

James H. Holcombe and J. Henry Fair, Jr.

    **6.**  On May 3, 1985, Susan Smythe conveyed the Site to Donld J. Hyde.

    **7.**  On May 3, 1985, Donald J. Hyde conveyed the Site to  James H. Holcombe and J.

Henry Fair, Jr.

**8.** On December 23, 1997, James H. Holcombe conveyed his ownership of the Site to Holcombe Enterprises, L.P.

**9.** On November 24, 2003, J. Henry Fair and Holcombe Enterprises, L.P. conveyed the Site to Ashley II of Charleston, LLC.

**Business History of Old CNC and New CNC**

**10.** Old CNC was owned by DSM North America, Inc., which was owned by DSM, N.V., a Dutch corporation.

**11.** On October 1, 1962, old CNC filed its Certificate of Incorporation in Delaware as Columbia Nitrogen Corporation.

**12.** In 1972, old CNC ceased fertilizer production at the Site.

**13.** In the meantime, old CNC produced ammonia and nitrogen products at a plant in Augusta, Georgia.

**14.** In order to realize a soon to expire $100 million tax advantage, DSM, N.V. decided to shut down old CNC.

**15.** The tax advantage required that old CNC be dissolved by December 31, 1986, and that no further activity or claims be presented to old CNC thereafter.

**16.** Old CNC sought a buyer in order to sell "Purchased Assets" and the "Acquired Business."[1]  Andlinger & Company, Inc. ("Andlinger"), a company that specializes in the

---

[1] The Purchased Assets are the assets owned by old CNC and include those assets that relate to or arise out of the Acquired Business.  Article I of the Acquisition Agreement defines the "Purchased Assets" as follows:

> Subject to the terms and conditions set forth in this Agreement, with effect from the Effective Date (as defined in Article VI), Seller shall sell, transfer, convey, and assign to Buyer, and Buyer shall purchase and acquire from Seller, all of the assets, properties, rights, franchises and privileges of every kind or

acquisition of other businesses, created new CNC under the name "CNC Corp." in order to purchase the Acquired Business and Purchased Assets from old CNC.

17.  On September 26, 1986, new CNC filed its Certificate of Incorporation in Delaware as CNC Corp.

18.  In the transaction conveying the Acquired Business and Purchased Assets from old CNC to new CNC, Stephen A. Magida and his law firm of Olwine, Connelly, Chase, O'Donnell & Weyher represented Andlinger and new CNC; Shearman and Sterling represented old CNC and DSM, North America.

19.  In order to convey the Acquired Business and Purchased Assets, old CNC and new CNC entered into a series of agreements.  The main agreement is called the Acquisition Agreement, and the series of agreements compose the Entire Agreement.[2]  Two agreements entered into in connection with the Acquisition Agreement include the Future Advance Agreement and the Guarantee Agreement.  The Future Advance Agreement and Guarantee Agreement were signed on November 3, 1986, and concern the financing of new CNC's

---

       nature, tangible or intangible, including without limitation contingent and unknown interests, claims[,] and rights and all warranties, guaranties and other rights to performance by third parties, owned by Seller or related to or arising out of the Acquired Business or the assets to be purchased hereunder, other than the Retained Assets (as defined in Article II), wherever located, as the same shall exist on the Effective Date with any changes therein through the Closing Date (hereinafter the "Purchased Assets"). . .

Recital A of the Acquisition Agreement defines Acquired Business as follows:

       Seller, as of the date hereof, operates a business that produces and sells ammonia and nitrogen-based products (the "Acquired Business").  The Acquired Business does not include any of the business operations, assets or liabilities of Nipro, Inc., a Delaware Corporation ("Nipro").

    [2] Section 16.7 of the Acquisition Agreement states that the Entire Agreement consists of the "Acquisition Agreement and all other agreements entered into in connection herewith."

purchase of the Acquired Business and Purchased Assets from old CNC.

**20.** On October 31, 1986, new CNC and old CNC signed the Acquisition Agreement.

**21.** The Effective Date of the Acquisition Agreement was October 31, 1986.

**22.** Closing under the Acquisition Agreement was concluded on November 6, 1986.

**23.** On November 6, 1986, new CNC changed its name from CNC Corp. to Columbia Nitrogen Corporation, the same name under which old CNC operated.

**24.** New CNC purchased the Acquired Business and Purchased Assets for $50 million, which represented a discount from book value of approximately 60 percent.[3]

**25.** For an additional $5 million dollar discount, new CNC bought the Acquired Business and Purchased Assets "as is."[4]

**26.** Stephen Magida, who represented Andlinger and New CNC, has testified that in exchange for a $5 million deduction in the purchase price, the purchase was made with the representations and warranties customary in the purchase of all of a company's stock because Andlinger was comfortable enough with its due diligence to conclude that any unknown liabilities would not exceed $5 million. Stephen Magida has testified that when one company

---

[3] In a confidential, internal memorandum entitled "Proposed Acquisition of Columbia Nitrogen Corporation," Andlinger summarized the investment opportunity of the proposed Acquisition of old CNC. The memo states that the purchase price of $50 million represents a 60 percent discount from book value.

[4] Paragraph 9.4 of the Acquisition Agreement states:
[T]he Purchased Assets are being sold by the Seller "AS IS." Buyer expressly acknowledges and accepts that no representations or warranties, express or implied, in fact or by law, of merchantability, fitness of any particular purpose or condition, are being made by the Seller concerning or with regard to the condition of the Acquired Business or Purchased Assets.

purchases the stock of another, the purchaser acquires the seller's assets and liabilities.

**27.**  This Court concludes that new CNC purchased the Acquired Business and Purchased Assets "as is" without any representations or warranties in exchange for the $5 million dollar discount.

**28.**  The parties knew that old CNC would liquidate immediately upon the sale of the Acquired Business and Purchased Assets.

**29.**  Pursuant to Paragraph 11.3 of the Acquisition Agreement, a condition precedent to new CNC's obligation was that new CNC receive an opinion letter from Shearman & Sterling, who represented old CNC and DSM, North America.

**30.**  Shearman & Sterling's opinion letter in connection with the Paragraph 11.3 of the Acquisition Agreement states: "Seller has adopted a plan of liquidation of Seller immediately following the Closing, and Seller has taken certain actions in anticipation of such dissolution and liquidation.  The Seller is duly qualified in the States of Florida, Georgia, North Carolina, and South Carolina."

**31.**  Old CNC dissolved immediately after it sold the Acquired Business and Purchased Assets to new CNC.  On November 6, 1986 old CNC filed with the Delaware Secretary of State a Certificate of Amendment to the October 1, 1962 Certification of Incorporation, changing its name to Augusta Liquidating Corp.  On November 19, 1986, Augusta Liquidating Corp. filed a Certificate of Dissolution with the Delaware Secretary of State.  On December 4, 1986, Augusta Liquidating Corp. filed a document with the Secretary of State of South Carolina surrendering its authority to transact business in South Carolina.

**32.**  Old CNC was producing ammonia and nitrogen based products in Augusta, Georgia,

when it sold the Acquired Business and Purchased Assets to new CNC.

**33.** After the transaction, new CNC continued to produce ammonia and nitrogen based products in Augusta.

**34.** Bill Copenhaver was the president of old CNC.

**35.** When new CNC purchased the Acquired Business and Purchased Assets from old CNC, Bill Copenhaver became the president of new CNC.

**36.** Five of the eight officers of old CNC became five of thirteen officers of new CNC. New CNC and old CNC did not share any common directors.

**37.** Old CNC was owned by DSM.

**38.** New CNC was owned by Andlinger, principals of Andlinger, and new CNC management.

**39.** New CNC agreed to offer employment to all of Old CNC's employees identified in Schedule 9.5 of the Acquisition Agreement upon terms and conditions for substantially equivalent positions.[5]  Consequently, new CNC hired approximately 200 of old CNC's 800 employees.  The remaining employees worked for Nipro or a newly created services company. Approximately 45 employees were left without any employment.

**40.** Ashley II and PCS agree that PCS is the successor to new CNC.  On November 29, 1989, Fertilizer Industries, Inc. filed a Certificate of Ownership and Merger, merging new CNC, Fertilizer Finance, Inc., and Triazone Corporation into Fertilizer Industries, Inc.  Fertilizer

---

[5] Paragraph 9.5 of the Acquisition Agreement states:
Buyer intends to make, and on the Closing Date will have made, an offer of employment, effective the Effective Date, to each employee of Seller listed on Schedule 9.5 upon terms and conditions and for a position substantially equivalent to that held by such employee on the Effective Date.

Industries, Inc. changed its name to Arcadian Corporation.  On March 6, 1997, Arcadian

Corporation filed a Certificate of Ownership and Merger with the Secretary of State of

Delaware, merging Arcadian Corporation into PCS Nitrogen, Inc. ("PCS").

## CONCLUSIONS OF LAW

**A.**  This civil action arises under the Comprehensive Environmental Response,

Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§9601, *et. seq.*

**B.**  Accordingly, the Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

**C.**  On July 25, 2006, the Court bifurcated this action.  This trial concerns only whether

PCS is the successor to old CNC, who owned and operated the Site at the time of the release of

the hazardous substance.

**D.**  The plaintiff bears the burden of proving that the defendant is a responsible party

under CERCLA.  42 U.S.C. § 9607(a); Minyard v. Southeastern Chem. & Solvent Co., 184 F.3d

373, 385 (4th Cir. 1999).  The plaintiff bears the burden of proving the defendant's liability by a

preponderance of the evidence.  Id.

**Federal Law**

**E.**  CERCLA is silent as to the liability of successor corporations.  *See* 42 U.S.C. §§

9601, et. seq., §9607(a); United States v. Carolina Transformer, 978 F.2d 832, 837 (4th Cir.

1992).

**F.**  Under federal law, a corporation which acquires the assets of another corporation

does not assume the environmental liabilities of the predecessor corporation unless one of the

following exceptions is met: (1) the successor expressly or impliedly agrees to assume the

predecessor's liabilities; (2) the transaction may be considered a de facto merger;[6] (3) the successor may be considered a mere continuation of the predecessor;[7] or (4) the transaction was fraudulent. United States v. Carolina Transformer, 978 F.2d 832, 837 (4th Cir. 1992). In addition, one corporation is the successor of another where there is substantial continuity between the successor and predecessor. Under the substantial continuity approach, a court should consider the following series of factors:

> (1) retention of the same employees
> (2) retention of the same supervisory personnel
> (3) retention of the same production facilities
> (4) production of the same product
> (5) retention of the same name
> (6) continuity of assets
> (7) continuity of general business operations
> (8) whether the successor holds itself out as the continuation of the previous enterprise

Id. The Court will consider the applicability of each of these four exceptions in turn as well as the applicability of the doctrine of substantial continuity.

### WHETHER NEW CNC EXPRESSLY OR IMPLIEDLY AGREED TO ASSUME OLD CNC'S LIABILITIES

#### Principles of Contract Interpretation under New York Law

---

[6] De facto merger is an equitable theory that applies where one corporation takes all of another's assets without providing any consideration that could be made available to meet claims of the other's creditors. Factors include: (a) continuity of management, personnel, physical location, assets, and general business operations; (b) continuity of ownership; (c) prompt cessation of the seller corporation's operations; and (d) assumption by the purchaser of obligations ordinarily necessary for the uninterrupted continuation of normal business operations of the seller. U.S. v. Davis Memorial Hosp., 956 F.2d 1163, *2 (4th Cir. 1992); Acme Boot Co. v. Tony Lama Interstate Retail Stores, Inc., 929 F.2d 691, *3 (4th Cir.1991).

[7] The successor is a mere continuation of the predecessor if after the transfer of assets, only one corporation remains, and there is an identity of stock, stockholders, and directors between the two corporations.

**G.** Section 16.3 of the Acquisition Agreement states that it is governed by New York law.   Under New York law, the initial interpretation of a contract is a matter of law for the court to decide.  Morgan Stanely Group, Inc., v. New England Ins Co., 225 F.3d 270, 275 (2d Cir. 2000).  Words and phrases should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions.  LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 206 (2d Cir. 2005).  Part of a court's initial interpretation of a contract is the question of whether the terms of the contract are ambiguous. Morgan Stanely Group, Inc., v. New England Ins Co., 225 F.3d at 275.  A contract is ambiguous if its terms are susceptible to more than one reasonable interpretation.  Evans v. Famous Music Corp., 1 N.Y.3d 452, 458 (N.Y. Ct. App. 2004). When a contract is ambiguous, extrinsic evidence is admissible to determine the intent of the parties.  Morgan Stanely Group, Inc., v. New England Ins Co., 225 F.3d at 275.  With these rules of construction in mind, the Court turns to the issue of whether new CNC agreed to assume old CNC's CERCLA liability for the Site.

## Assumption of old CNC's Obligations to be Performed Under Court, Regulatory, or Administrative  Order

**H.**  New CNC  expressly assumed old CNC's CERCLA liability in Paragraph 3.4 of the Acquisition Agreement, in which new CNC assumed "[a]ll obligations required to be performed under all court, administrative, and regulatory orders applicable to the Seller."

**I.**  The CERCLA response costs arising out of a release of a hazardous substance that occurred at the Site in Charleston during old CNC's ownership of the Site is an obligation applicable to old CNC and required to be performed under regulatory orders of the United States Environmental Protection Agency and South Carolina Department of Health and Environmental Control.

**J**.  Therefore, new CNC assumed liability for old CNC's CERCLA response costs at the Site.

### The Parties' Positions

**K.**  The parties agree that the Acquisition Agreement determines whether new CNC assumed old CNC's CERCLA liability related to the Site.  Both Ashley II and PCS claim that the Acquisition Agreement is unambiguous and should be interpreted as a matter of law.  However, the parties dispute the meaning of the term "Acquired Business."  The meaning of this term is significant because Article III of the Acquisition Agreement defines the "Assumed Liabilities" as old CNC's liabilities, which relate to the Acquired Business and Purchased Assets.[8]

**L.**  PCS argues that the October 31, 1986 transaction was an asset sale in which new CNC acquired old CNC's Augusta plant.  PCS relies on Recital A of the Acquisition Agreement which states:

> Seller, as of the date hereof, operates a business that produces and sells ammonia and nitrogen-based products (the "Acquired Business").  The Acquired Business does not include any of the business operations, assets or liabilities of Nipro, Inc., a Delaware Corporation ("Nipro").

PCS alleges that the Acquired Business is limited to the production of nitrogen and ammonia-based products in Augusta, Georgia, at the time of the transaction.  Therefore, PCS concludes that the liabilities assumed by new CNC are limited to the production of nitrogen and ammonia

---

[8] Article III of the Acquisition Agreement defined the Liabilities to be Assumed by Buyer as:

> any and all liabilities and obligations of Seller relating to the Acquired Business and Purchased Assets, other than the Retained Liabilities (as Defined in Article IV), whether absolute, accrued, contingent or otherwise, whether known or unknown and whether or not disclosed in the financial statements of Seller or otherwise and whether relating to conditions existing or to events or occurrences before or after the Effective Date (the "Assumed Liabilities").

based products at the Augusta plant.

**M.**  In response, Ashley II argues that the parties intended a stock sale and that new CNC assumed all of old CNC's liabilities because when one company purchases the stock of another, the purchaser acquires all of the assets and liabilities that the seller had.  Ashley II relies on Recital B of the Acquisition Agreement which states:

> Seller desires to sell to Buyer, and Buyer desires to purchase from Seller the Acquired Business, and Buyer is willing to acquire all of the property and assets relating to the Acquired Business, except as set forth herein, and to assume all obligations and liabilities relating to the Acquired Business, except as set forth herein, as if Seller were to sell and Buyer were to purchase the stock of Seller on the open market for the considerations and upon and subject to the terms and conditions set forth herein.

Ashley II claims that the meaning of this provision is that new CNC assumed all of old CNC's liabilities except for those expressly retained by old CNC or those relating to assets which were sold to another entity.  Article IV of the Acquisition Agreement specifically limits old CNC's Retained Liabilities to taxes, extraordinary indebtedness owed to old CNC's affiliates, certain employee severance obligations, liabilities "arising out of or relating to the business and operations of Nipro," and unpaid wages.

### Whether the Acquisition Agreement is Ambiguous

**N.**  At first glance, PCS appears to present a strong, plain text argument that the October 31, 1986 transaction was limited to the sale of old CNC's ammonia and nitrogen-based product operations in Augusta.  However, in Recital B the parties expressly stated that they effected a stock sale.  In addition, Article I of the Acquisition Agreement does not limit the Purchased Assets to those assets which relate to the Acquired Business; instead, the Purchased Assets include all assets owned by old CNC including those assets related to or arising out of the

Acquired Business other than the Retained Assets.

**O.**  PCS claims that its liabilities are limited to those which relate to the production of ammonia and nitrogen-based products in Augusta.  However, in Paragraph 3.4, new CNC specifically assumed liabilities that were not limited to the production of ammonia and nitrogen-based products in Augusta:

> All obligations required to be performed under all court, administrative, and regulatory orders applicable to the Seller, the Acquired Business or the purchased Assets.

**P.**  Based on the parties' express intentions and these conflicting terms, the Acquisition Agreement suggests more than one reasonable interpretation of the term "Acquired Business." The Court therefore holds that the definition of "Acquired Business" in Recital A is ambiguous and that extrinsic evidence may be presented to determine whether the parties intended to limit the October 31, 1986 transaction to the sale of old CNC's ammonia and nitrogen-based product operations in Augusta.

### Extrinsic Evidence

### Parties Intent- a Transaction Tantamount to a Stock Sale

**Q.**  As evidenced by Recital B of the Acquisition Agreement, the parties intended a transaction tantamount to a stock sale.  Stephen Magida represented new CNC and Andlinger in the October 31, 1986 transaction.  Stephen Magida testified that when one company purchases the stock of another, the purchaser acquires the seller's assets and liabilities.  The intent of the parties and Stephen Magida's testimony evidence that the Acquired Business includes all of old CNC and all of old CNC's assets and liabilities that were not specifically retained or sold to another entity.

**Parties Intent- that Old CNC be Dead and Buried**

**R.** DSM and old CNC intended that old CNC cease to exist.  In order to realize a soon to expire $100 million tax advantage, DSM, N.V. decided to shut down old CNC.  The tax advantage required that old CNC be dissolved by December 31, 1986, and that no further activity or claims be presented to old CNC thereafter.

**S.** Andlinger and new CNC knew that old CNC must be "dead and buried" by December 31, 1986.

> **1.** First, Andlinger assessed the profitability of the transaction in a confidential, internal memorandum entitled "Proposed Acquisition of Columbia Nitrogen Corporation."  In the memorandum, Andlinger states that old CNC "must be liquidated before the end of 1986."

> **2.** Second, Article XI of the Acquisition Agreement states that a condition precedent to the obligation of new CNC was that new CNC receive an opinion letter from Shearman & Sterling.  Shearman & Sterling's opinion letter to new CNC states: "Seller has adopted a plan of liquidation . . . immediately following the Closing, and Seller has taken certain actions in anticipation of such dissolution and liquidation."

**T.** The intent of DSM and old CNC and new CNC's knowledge of that intent support Ashley II's proposition that the Acquired Business includes all of old CNC that was not specifically retained or sold to another entity.

**Deep Discounted Price in Exchange for the Assumption of the Risk of Unknown Liabilities**

**U.** In Andlinger's confidential, internal memorandum entitled "Proposed Acquisition of Columbia Nitrogen Corporation," Andlinger summarized the investment opportunity of the

proposed Acquisition of old CNC.  The memo states that the purchase price of $50 million

represents a 60 percent discount from book value.

**V.**  New CNC received an additional $5 million dollar discount in exchange for buying

the Acquired Business and Purchased Assets "as is."[9]

**W.**  Stephen Magida testified that Andlinger was comfortable enough with its due

diligence to conclude that any unknown liabilities would not exceed $5 million.

**X.**  Therefore, new CNC willingly assumed the risk of unknown liabilities.

**Y.**  The discounted purchase price and additional $5 million discount support Ashley II's

proposition that the Acquired Business includes all of old CNC that was not specifically retained

or sold to another entity.

### New CNC's Intent to Acquire Substantially All of Old CNC

**Z.**  Section 16.7 of the Acquisition Agreement states that all agreements entered into in

connection with the Acquisition Agreement compose the Entire Agreement.  Two agreements

entered into in connection with the Acquisition Agreement include the Future Advance

Agreement and the Guarantee Agreement.

**1.**  The Future Advance Agreement and Guarantee Agreement were both signed

on November 3, 1986, by Joseph Loredo, the chairman of new CNC and President of

---

[9] This provision is set forth in Paragraph 9.4 of the Acquisition Agreement:
   [T]he Purchased Assets are being sold by the Seller "AS IS."  Buyer
   expressly acknowledges and accepts that no representations or warranties,
   express or implied, in fact or by law, of merchantability, fitness of any
   particular purpose or condition, are being made by the Seller concerning
   or with regard to the condition of the Acquired Business or Purchased
   Assets.

Andlinger, and these agreements concern the financing of the conveyance of the

Acquired Business and Purchased Assets from old CNC to new CNC.

2. In both agreements, new CNC stated that it was purchasing "substantially all"

of old CNC's business and acquiring "substantially all" of old CNC's liabilities.[10] The

broad language "substantially all" contradicts PCS's arguments: (1) that new CNC

limited the October 31, 1986 transaction to the sale of old CNC's ammonia and nitrogen-

based product operations in Augusta, and (2) that new CNC limited its liabilities to those

related to old CNC's ammonia and nitrogen-based product operations in Augusta.

AA. The Guarantee Agreement and Future Advance Agreement support Ashley II's

proposition that the Acquired Business includes all of old CNC that was not specifically retained

or sold to another entity.

### Meaning of the term "Acquired Business"

BB. The Court finds that the Acquired Business includes all of old CNC that was not

specifically retained or sold to another entity. Old CNC did not specifically retain its CERCLA

liability for the hazardous release at the Site in Charleston; nor did old CNC convey this liability

---

[10] The first substantive paragraph of the Guarantee Agreement states:
> Whereas, pursuant to the terms of an Acquisition Agreement dated as of October 31, 1986, (the "Acquisition Agreement", between [old CNC] and [new CNC, new CNC] is purchasing from [old] CNC substantially all of [old] CNC's business, assets and operations and assuming substantially all of [old] CNC's liabilities (collectively the "Business").

Similarly, the first sentence of the Future Advance Agreement which new CNC entered into with INELBO, B.V., a Netherlands corporation and the lender states:
> Borrower's [Andlinger's] wholly owned subsidiary [new CNC] has entered into an agreement dated as of October 31, 1986, providing for, *inter alia*, the purchase by such subsidiary of substantially all of the assets and liabilities of Columbia Nitrogen Corporation, a Delaware corporation and an affiliate of Lender.

to another party.  Accordingly, when new CNC bought the Acquired Business, new CNC bought a company that was producing ammonia and nitrogen-based products in Augusta, Georgia, and new CNC bought a company that had released hazardous substances in the course of its production of phosphate fertilizer at the Site in Charleston, South Carolina.  Therefore, old CNC's CERCLA liability for the hazardous release at the Site relates to the Acquired Business, and new CNC assumed this liability.

### WHETHER THE TRANSACTION MAY BE CONSIDERED A DE FACTO MERGER

CC.  The equitable theory of de facto merger provides that when one corporation takes all of another corporation's assets without providing consideration that can be made available to meet the claims of the predecessor's creditors, the successor corporation assumes the predecessor's environmental liabilities.  *See* United States v. Carolina Transformer, 978 F.2d 832, 837-38 (4th Cir. 1992); U.S. v. Davis Memorial Hosp., 956 F.2d 1163, *2 (4th Cir. 1992). In this case, there was no de facto merger because new CNC did not take all of old CNC's assets; old CNC sold some assets to Nipro.

### WHETHER NEW CNC MAY BE CONSIDERED A MERE CONTINUATION OF OLD CNC

DD.  Under the doctrine of mere continuation, a successor corporation may be considered a mere continuation of the predecessor corporation if after the transfer of assets, only one corporation remains, and there is an identity of stock, stockholders, and directors between the two corporations.  *See* United States v. Carolina Transformer, 978 F.2d 832, 837-38 (4th Cir. 1992).  New CNC is not the mere continuation of old CNC because new CNC and old CNC did not share any common directors.

**WHETHER THE TRANSACTION WAS FRAUDULENT**

**EE.** A successor corporation assumes environmental liability of the predecessor corporation when the transaction entered into by the parties is fraudulent. *See* United States v. Carolina Transformer, 978 F.2d 832, 837-38 (4th Cir. 1992). The parties do not claim that the October 31, 1986 transaction was fraudulent. The evidence does not show that the transaction was fraudulent, and the Court holds that the transaction was not fraudulent.

**WHETHER THERE IS SUBSTANTIAL CONTINUITY BETWEEN OLD CNC AND NEW CNC**

**FF.** One corporation is the successor of another where there is substantial continuity between the successor and predecessor. Under the substantial continuity approach, a court should consider the following series of factors:

(1) retention of the same employees
(2) retention of the same supervisory personnel
(3) retention of the same production facilities
(4) production of the same product
(5) retention of the same name
(6) continuity of assets
(7) continuity of general business operations
(8) whether the successor holds itself out as the continuation of the previous enterprise

*See* United States v. Carolina Transformer, 978 F.2d 832, 837-38 (4th Cir. 1992).

**GG.** There is substantial continuity between new CNC and old CNC. There was a continuity of personnel between old CNC and new CNC; new CNC hired approximately 200 of old CNC's 800 employees. Bill Copenhaver acted as the president of both corporations, and five of the eight officers of old CNC became five of thirteen officers of new CNC. There was a continuity of general business operations between old CNC and new CNC; new CNC continued to produce ammonia and nitrogen based products in August, Georgia. In addition, new CNC

retained old CNC's name: "Columbia Nitrogen Corporation." There was a continuity of assets between old CNC and new CNC; pursuant to Article I of the Acquisition Agreement, new CNC acquired all of old CNC's assets that were owned by old CNC, including those assets that related to or arose out of the Acquired Business.

**HH.** In addition, new CNC held itself out as the continuation of old CNC. Joseph Loredo, president of Andlinger and chairman of new CNC, sent letters dated October 21, 1986, to old CNC's creditors stating:

> It is with great pleasure that we announce to you that on or about October 31, 1986, [new CNC] will acquire the business and substantially all the assets and liabilities of [old CNC] in a bulk transaction.

**II.** In addition, the letters informed old CNC's creditors that the debts are to be paid in full as they fall due as a result of the transaction and that the creditors should send their bills to new CNC at a specified Post Office box in Augusta.

**JJ.** Therefore, the Court holds that there is substantial continuity between new CNC and old CNC, and that as a result of this substantial continuity, new CNC assumed old CNC's environmental liability related to the Site.

**South Carolina Law**[11]

**KK.** Under South Carolina law, a corporation which acquires the assets of another corporation does not assume the liabilities of the predecessor corporation unless one of the following exceptions is met: (1) the successor agreed to assume the debts of the predecessor; (2) the circumstances surrounding the transaction warrant a finding of consolidation or merger of the

---

[11] New York law applies to the interpretation of the Acquisition Agreement. However, the Court has examined federal law and South Carolina law to determine whether new CNC is the successor to old CNC.

two corporations;[12] (3) the successor was a mere continuation of the predecessor;[13] or (4) the transaction was entered into fraudulently for the purpose of wrongfully defeating creditors' claims. Simmons v. Mark Lift Indus., Inc., 622 S.E.2d 213, 215 (S.C. 2005).

### Whether new CNC agreed to Assume the Debts of old CNC

**LL.** In Article III of the Acquisition Agreement new CNC agreed to assume the debts of old CNC.[14] In addition, as stated above, Joseph Loredo, president of Andlinger and chairman of new CNC, sent letters dated October 21, 1986, to old CNC's creditors stating: (1) that a bulk sale transfer is about to be made; (2) that the debts are to be paid in full as they fall due as a result of the transaction; and (3) that the creditors should sent their bills to a post office box in Augusta. Therefore, new CNC agreed to assume old CNC's liabilities, and under South Carolina law, new CNC assumed old CNC's CERCLA liability related to the Site.

### Whether the circumstances surrounding the transaction warrant a finding of

---

[12] The circumstances warrant a finding of consolidation or merger when the evidence is susceptible of no other inference than that the predecessor had gone out of existence, leaving no one to be sued by its creditors and no property to satisfy its debts; that it had become consolidated or merged into the predecessor; and that liability for outstanding claims against it had been expressly or impliedly assumed by the successor corporation. Huggins v. Commercial and Savings Bank, 140 S.E. 177, 186 (S.C. 1927).

[13] The mere continuation exception is applicable only where there is a commonality of ownership, *i.e.* the predecessor and successor corporations have substantially the same officers, directors, and shareholders. Simmons v. Mark Lift Indus., Inc., 622 S.E.2d 213, 215 (S.C. 2005).

[14] New CNC's Assumed Liabilities include:
[A]ny and all liabilities and obligations of Seller relating to the Acquired Business and Purchased Assets, other than the Retained Liabilities . . . whether absolute, accrued, contingent or otherwise, whether known or unknown and whether or not disclosed in the financial statements of Seller or otherwise and whether relating to conditions existing or to events or occurrences before or after the Effective Date (the "Assumed Liabilities").

**consolidation or merger of old CNC and new CNC**

**MM.**  In this case, the circumstances surrounding the transaction by which new CNC bought the Acquired Business and Purchased Assets from old CNC warrant a finding of consolidation or merger of the two corporations.  The evidence is susceptible of no other inference than that old CNC immediately went out of existence after the transaction, leaving no one to be sued by its creditors and no property to satisfy its debts.

> **1.**  After the transaction, old CNC immediately dissolved.  Old CNC's intent to dissolve was mentioned expressly in Shearman & Sterling's opinion letter to new CNC and in new CNC's confidential, internal memorandum assessing the profitability of the transaction.

> **2.**  Both parties instructed old CNC's creditors to send bills to new CNC.

> **3.**  After the transaction,  old CNC held no property, and only new CNC remained to be sued by old CNC's creditors.

Accordingly, the Court finds that under South Carolina law there was a consolidation or merger between old CNC and new CNC.

**Whether new CNC is a mere continuation of old CNC**

**NN.**  Under South Carolina law, the mere continuation exception is applicable only where there is a commonality of ownership.  DSM owned old CNC.  Andlinger owned new CNC.  Therefore, in this case, new CNC was not the mere continuation of old CNC because there was no commonality of ownership.

**Whether new CNC and old CNC entered into the transaction fraudulently for the purpose of wrongfully defeating creditors' claims**

**OO.**  The October 31, 1986 transaction was not entered into fraudulently for the purpose

of wrongfully defeating creditors' claims.  The parties do not claim that the October 31, 1986 transaction was fraudulent.  The evidence does not show that the transaction was fraudulent, and the Court holds that the transaction was not fraudulent.

**Conclusion**

For the foregoing reasons, new CNC is the successor to old CNC.  The parties agree that PCS is the successor to new CNC.  The Court holds that the defendant PCS is the successor to old CNC.

**AND IT IS SO ORDERED.**

**C . WESTON HOUCK**
**UNITED STATES DISTRICT JUDGE**

September 28, 2007
Charleston, South Carolina