IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Ashley II of Charleston, LLC, | ) | Civil Action No. 2:05-cv-2782-MBS |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **ORDER AND OPINION** |
| PCS Nitrogen, Inc., | ) | |
| | ) | |
| Defendant/Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Ross Development Corporation; J. Holcombe Enterprises, L.P.; James H. Holcombe; J. Henry Fair, Jr.; Allwaste Tank Cleaning, Inc. n/k/a PSC Container Services, LLC; Robin Hood Container Express, Inc.; City of Charleston, South Carolina, | ) ) ) ) ) ) ) ) ) | |
| Third-Party Defendants. | ) ) ) | |

This was a cost-recovery action brought under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), as amended, 42 U.S.C. §§ 9601, *et seq.*, to recover costs incurred to remediate 33.95 acres of a 43 acre parcel of land in Charleston, South Carolina ("the Site"). On September 26, 2005, this lawsuit was filed under CERCLA § 107 (42 U.S.C. § 9607) by one of the Site's current owners, Ashley II of Charleston, LLC ("Ashley"), against PCS Nitrogen, Inc. ("PCS"), seeking a declaratory judgment that PCS is jointly and severally liable for the cost of remediating the Site; and a money judgment in the amount of $194,232.94 to reimburse Ashley for costs of remediation that it had already incurred. [Entry 1 at ¶¶ 28-36; Entry

209 at ¶¶ 31-37].

PCS filed contribution claims pursuant to CERCLA § 113(f)(1) against Ashley, Ross Development Corporation ("Ross"); Koninklijke DSM N.V., and DSM Chemicals of North America, Inc. (collectively "the DSM Parties"); James H. Holcombe ("Holcombe"), J. Holcombe Enterprises, L.P. ("Holcombe Enterprises"), and J. Henry Fair, Jr. ("Fair") (collectively "The Holcombe and Fair Parties"); Allwaste Tank Cleaning (n/k/a PSC Container Services, LLC) ("Allwaste"); Robin Hood Container Express, Inc. ("RHCE"); and the City of Charleston, South Carolina ("the City"), alleging that each third party was a potentially responsible party ("PRP"). [Entry 226]. Several of the third-parties also filed claims.

The case was bifurcated into liability and allocation phases by order of The Honorable C. Weston Houck on July 25, 2006. [Entry 56]. On September 28, 2007, pursuant to Federal Rule of Civil Procedure 52, Judge Houck entered Findings of Fact and Conclusions of Law determining PCS to be the successor-in-interest to former Site owner, Columbia Nitrogen Corporation ("CNC"). [Entry 118]. The case was reassigned to the undersigned on January 6, 2009. [Entries 307 and 308]. On August 13, 2009, the court granted summary judgment to the DSM Parties. [Entry 409]. On September 30, 2010, the court issued an order and opinion containing its findings of fact and conclusions of law. [Entry 561]. On October 13, 2010, the court issued an amended order and opinion (hereinafter "order and opinion"). [Entry 563].

This case is currently before the court for a ruling on five motions to amend or correct the judgment, or for reconsideration. [Entries 567, 568, 569, 570 and 572]. All parties except for the City and Allwaste seek changes to the court's order and opinion. In conjunction with this order, the court is issuing its second amended order and opinion containing its findings of fact and conclusions

2

of law.  The court dispenses with the facts in this order as the facts are discussed in detail in the second amended order and opinion filed contemporaneously herewith.

<u>**DISCUSSION**</u>

### I.    Standard

#### A.    Rule 52(b)

Federal Rule of Civil Procedure 52(b) provides, in pertinent part, as follows: "On a party's motion filed no later than 28 days after the entry of judgment, the court may amend its findings—or make additional findings—and may amend the judgment accordingly."  *Id.*

#### B.    Rule 59(e) Standard

Although Rule 59 addresses grounds for new trials, some courts have reasoned that the concept of a new trial under Rule 59 is broad enough to include a rehearing of any matter decided by the court without a jury. 11 Wright & Miller, FEDERAL PRACTICE & PROCEDURE § 2804. However, motions for reconsideration are inappropriate merely to introduce new legal theories or new evidence that could have been adduced during the pendency of the prior motion.  *Keene Corp. v. Int'l Fid. Ins. Co.*, 561 F. Supp. 656, 665 (N.D. Ill. 1982), *aff'd*, 736 F.2d 388 (7th Cir. 1982).  The Fourth Circuit recognizes only three limited grounds for a district court's grant of a motion under Rule 59(e):  1) to accommodate an intervening change in controlling law; 2) to account for new evidence not available earlier; or 3) to correct a clear error of law or prevent manifest injustice. *Hutchinson v. Staton*, 994 F.2d 1076, 1081 (4th Cir. 1993).  The Fourth Circuit has emphasized that mere disagreement with the court's ruling does not warrant a Rule 59(e) motion.  *Id.* (citing *Atkins v. Marathon LeTourneau Co.*, 130 F.R.D. 625, 626 (S.D. Miss. 1990)).

II. **Ashley's Motion to Amend Judgment**

A. **Bona Fide Prospective Purchaser ("BFPP") Status**

Ashley contends that the court's order and opinion misapplies CERCLA § 101(H)(i) by stating that BFPP status can be defeated simply because a party is "the current owner of the majority of the Site on which hazardous materials are still leaching through the soil." [Entry 572 at 4 (citing 563 at 103)]. Ashley argues that the court's ruling implicitly holds that "continued leaching through the soil" during Ashley's ownership imposes a category of CERCLA liability on a current owner in addition to that created solely by the status of current ownership under CERCLA § 107(a)(1). [Entry 572 at 5]. Ashley argues that a holding that "continued leaching" defeats BFPP status would frustrate the policy behind the BFPP defense to CERCLA liability because virtually no current owner of a Site requiring cleanup would meet this requirement. [Entry 572 at 5, Entry 594 at 4-5]. It was not the court's intention to hold that BFPP status can be defeated by continued leaching of contaminants through the soil. The court will clarify its holding.

Title 42 U.S.C. § 9601(40)(H), which is CERCLA § 101(40)(H), is the no affiliation requirement of the BFPP defense. Section 9601(40)(H) states:

> The person is not- -
>
> > (i) potentially liable, or affiliated with any other person that is potentially liable, for response costs at a facility through- -
> >
> > > (I) any direct or indirect familial relationship; or
> > >
> > > (II) any contractual, corporate, or financial relationship (other than a contractual, corporate, or financial relationship that is created by the instruments by which title to the facility is conveyed or financed or by a contract for the sale of goods or services). . . .

4

The no affiliation requirement therefore requires that Ashley show that it is not: a) potentially liable, for response costs at a facility through: 1) any direct or indirect familial relationship, or 2) any contractual, corporate, or financial relationship (other than a contractual, corporate, or financial relationship that is created by the instruments by which title to the facility is conveyed or financed or by a contract for the sale of goods or services); or b) affiliated with any other person that is potentially liable for response costs at a facility through 1) any direct or indirect familial relationship, or 2) any contractual, corporate, or financial relationship (other than a contractual, corporate, or financial relationship that is created by the instruments by which title to the facility is conveyed or financed or by a contract for the sale of goods or services).

A current owner is not ineligible for BFPP status merely because it is a PRP. The reason that Ashley did not meet the no affiliation requirement of BFPP status is that Ashley is potentially liable for response costs due to a contractual relationship with the Holcombe and Fair Parties. The court's second amended order and opinion reflects this clarification.

### B.     Holcombe and Fair Indemnification

Ashley contends that the court's order appears to address contractual indemnification between Ashley and the Holcombe and Fair Parties, which Ashley contends, was not in issue before the court. [Entry 572 at 6]. Ashley seeks amendment of the court's order to the extent it refers to the release between Ashley and the Holcombe and Fair Parties as an indemnity. [Entry 572 at 7]. Ashley asserts that the use of the word "indemnity" instead of "release" could lead to the mistaken belief that the court's ruling was based on an interpretation of the indemnity provisions in the contract, rather than the release provisions. [Entry 572 at 8-9]. Ashley contends that the effect of the release is that PCS is entitled to a set-off against Ashley's joint and several liability judgment.

5

[Entry 572 at 8-9].

The court used the word "indemnity" because the release provision is located under the subtitle "Environmental Indemnity." [*See* Ash. Ex. 94 at 28-30]. As the Holcombe and Fair Parties have not objected to Ashley's proposed change in wording, and the proposed change will not affect the substance of the court's ruling, pursuant to Rule 52(b), the court has adopted Ashley's proposed word change in its second amended order and opinion.

**III.    PCS's Motion Seeking Reconsideration and Clarification**

    **A.    Divisibility of Harm**

        1.    PCS's General Arguments

PCS asks that the court reconsider whether PCS's proposed apportionment methods either separately or taken together, satisfy PCS's evidentiary burden of showing a reasonable basis for apportionment. [Entry 569-1 at 2]. PCS makes three general arguments. First, PCS contends that the court held PCS to an impermissibly high standard. [Entry 569-1 at 2]. Second, PCS contends that the court improperly required it to provide a "single" apportionment method that accounted for both the volume of contaminants and the spread of contaminants throughout the Site, which PCS contends, is scientifically impossible. [Entry 569-1 at 3]. Third, PCS contends that "under the facts of this case, a reasonable apportionment method does not have to measure the spreading of contamination throughout the Site." [Entry 569-1 at 17]. Fourth, PCS argues that the court's ruling that the harm at the Site is not divisible is contrary to the Supreme Court's analysis in *Burlington Northern and Santa Fe. Ry. Co. v. United States*, 129 S. Ct. 1870, 1881 (2009). [Entry 569 at 6].

a.    *The Court Did Not Hold PCS to an Impermissibly High Standard*

PCS contends that the court held PCS to an onerous burden by requiring PCS to account "precisely for every instance in which contamination was added to the Site, as well as every instance in which contamination was spread across the Site." [Entry 569-1 at 2]. The court does not agree that this was the standard to which it held PCS.

Liability under CERCLA § 107(a) is joint and several if the harm is indivisible. *United States v. Monsanto Co.*, 858 F.2d 160, 171 (4th Cir. 1988). Divisibility is a legal defense to joint and several liability under CERCLA in which a party makes "a causation-based argument that the cleanup costs at a single CERCLA facility should be divided between [a defendant] and another responsible party." *IIIT Indus., Inc. v. Borgwarner, Inc.*, File No. 1:05-CV-674, 2010 WL 1172533, at *24 (W.D. Mich. Mar. 24, 2010) (citing *U.S. Bank Nat. Ass'n v. EPA*, 563 F.3d 199, 207 (6th Cir. 2009). In seeking to avoid joint and several liability, PCS had the burden of demonstrating that a reasonable basis for apportionment of the harm at the Site exists. *Burlington Northern*, 129 S. Ct. at 1881.

"[T]he universal starting point for divisibility of harm analyses in CERCLA cases is § 433A of the Restatement (Second) of Torts." *Id.* at 1881 (internal citations omitted).

> Under the Restatement, when two or more persons acting independently caus[e] a distinct or single harm for which there is a reasonable basis for division according to the contribution of each, each is subject to liability only for the portion of the total harm that he has himself caused. . . . But where two or more persons cause a single and indivisible harm, each is subject to liability for the entire harm.

*Burlington Northern*, 129 S. Ct. at 1881 (citing Restatement (Second) of Torts, §§ 433A, 881 (1976)). Not all harms can be apportioned. *Id.* A party invoking the doctrine of divisibility is required to show that "(a) there are distinct harms, or (b) there is a reasonable basis for determining

7

the contribution of each cause to a single harm." *IIIT Indus.*, 2010 WL 1172533, at *24; *see also Burlington Northern*, 129 S. Ct. at 1881 (citing Restatement (Second) of Torts § 433A(1)(b) at 434 (1963-1964)).

Proving that harm at a CERCLA site is divisible can be difficult because of "the commingling of wastes, the migration of contamination over time, and other complex fact patterns." 8 Bus. & Com. Litig. Fed. Cts. § 95:24 (2d ed.) (citing *United States v. Ottati & Goss, Inc.*, 630 F. Supp. 1361 (D.N.H. 1985)). "Where causation is unclear, courts should not hasten to 'split the difference' in an attempt to achieve equity . . . courts lacking a reasonable basis for dividing causation should avoid apportionment altogether by imposing joint and several liability." *United States v. Atchison, Topeka & Santa Fe Ry. Co.*, Nos. CV F 92 5068 OWW, CV F 96 6226 OWW, CV F 96 6228, 2003 WL 25518047, at *84 (E.D. Cal. July 15, 2003) (citing *United States v. Hercules, Inc.*, 247 F.3d 706, 718-19 (8th Cir. 2001); *United States v. Township of Brighton*, 153 F.3d 307, 319 (6th Cir. 1998)); *see also Burlington Northern*, 129 S. Ct. at 1881 (citing Restatement (Second) of Torts § 433A, cmt i. at 440 (1963-1964)) ("when two or more causes produce a single, indivisible harm, courts have refused to make an arbitrary apportionment for its own sake, and each of the causes is charged with responsibility for the entire harm.") (internal quotation omitted). The divisibility issue presents an intensely factual analysis. *See United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 269 (3d Cir. 1992).

Contrary to PCS's contention, the court did not require PCS to precisely account for each party's contribution to contamination at the Site. Nowhere in the court's opinion did the court state that the reason PCS had failed to meet its burden on the divisibility issue was due to a lack of precise numbers. The court held PCS to the appropriate standard of providing the court with a reasonable

8

basis for apportionment while keeping in mind that such an analysis is necessarily fact-specific and that an apportionment should not be made arbitrarily for the sake of preventing the imposition of joint and several liability.  Indeed, an arbitrary apportionment would run contrary to CERCLA's strict liability scheme and goal of making those responsible for pollution pay.  *See Burlington Northern*, 129 S. Ct. at 1874 (CERCLA was designed to ensure that the cost of cleanup is borne by those responsible for the contamination); *Agere Sys., Inc. v. Advanced Envtl. Tech. Corp.*, 602 F.3d 204, 228 (3d Cir. 2010) (CERCLA intended to make polluters pay for the costs of cleanup).

b.    *The Court Did Not Hold PCS to a Scientifically Impossible Standard*

PCS contends that the court improperly required it to provide a "single" apportionment method that accounted for both the volume of contaminants and the spread of contaminants across the Site.  [Entry 569-1 at 5, 15].  The court disagrees.

PCS's argument is based upon a misinterpretation of the court's opinion.  The court's opinion was not intended to indicate that PCS was required to provide a single apportionment method that accounted for both the volume of the contaminants and the spread of the contaminants throughout the Site.  Instead, based upon evidence presented at trial that the volume of contaminants and the spread of those contaminants throughout the Site were the two main factors contributing to the remediation costs, the court determined that any reasonable apportionment of the remediation costs would have to take into account both of these factors.  This did not mean, as PCS contends, that a single apportionment method was required.  Apportionment based upon the volume and spread of contaminants could have been accomplished through the use of a mathematical formula that combined a reasonable method for measuring contaminant volume with a reasonable method for

9

measuring the spread of contaminants. This is what the court meant by its statement that "reasonably accurate calculations of the volume of contaminants" represent "only half of the equation." [Entry 563 at 80].[1]

       c.     *The Facts of the Case Indicate that the Spread of Contamination Significantly Contributed to the Harm at the Site*

PCS contends that the contamination at this Site was, from the time it was discharged, mixed with Site soil, and that subsequent soil disturbance did not significantly impact the size of the remediation area. [Entry 569-1 at 19]. Therefore, PCS contends that the volume of contamination contributed to the Site by Planters and CNC is a reasonable basis for apportionment, and that an apportionment need not take into account the spread of contamination across the Site to be reasonable. [Entry 569-1 at 17]. The court disagrees. PCS's argument that a proxy for the spread of contamination throughout the Site is not necessary because soil disturbances did not significantly impact the remediation area is essentially a disagreement with the court's factual findings. In paragraph 16 of the court's order and opinion, the court found:

> The cost of the remediation is directly related to the volume of contaminated soil on the Site. [Trial Tr. 701:6-11]. The predominant factors contributing to the cost of the cleanup are the amount of hazardous materials and the spread of these hazardous materials throughout the Site. [Ash. Ex. 162 at 12; Trial Tr. 812:6-11, 1587:9-15, 1943:11-15].

[Entry 563 ¶ 16]. The testimony of Dr. Brian Murphy ("Murphy") provides some support for PCS's argument. Murphy testified that "the whole [S]ite [wa]s so massively contaminated that earth-moving activities simply move - - place things from one contaminated location to another

---

[1]     PCS has obtained the affidavits of two experts who state that no single apportionment method could meet the apportionment standard articulated by the court. [Entry 569-1 at 15]. However, because the court did not require a single apportionment method to account for both of the main factors contributing to the contamination at the Site, these affidavits are irrelevant.

contaminated location" and that the Site was as fully contaminated in 1966 as it is now.  [Trial Tr. 1567:9-18; *see also* Trial Tr. 1589:7-10 ("My opinion is that I agree with Mr. Hutto that the [S]ite was massively contaminated as of 1933, and that any subsequent motion has basically been pushing contamination from one contaminated area to another."); 1618:7-10 ("I've already testified that the [S]ite was so massively contaminated as of 1933 that any soil movement would just move material from one contaminated area to another.  I agree with Mr. Hutto on that.")].

There was, however, conflicting testimony on the effect of earth moving activities on the extent of the contamination at trial.   Tom Hutto ("Hutto") testified that:

> On this particular [S]ite, my observation was there was already widespread waste on the the - - distributed around the [S]ite, and that was borne out not only our [S]ite observations of the land surface, but also the reports of what was in the test pits that were excavated all over the [S]ite.

[Trial Tr. 510:11-16; *see also* Trial Tr. 511:1-4 (Hutto stating: "The excavation and grading of the soil in this case did not worsen the contamination because it was covered with - - one. there was already, based on our observations and our report, was already with widespread waste materials on the Site.")].  The context of Hutto's testimony indicates that his opinion referred to the state of the Site at the time of the Holcombe and Fair Parties' ownership period, which was subsequent to substantial earth moving activities such as the demolition of the plant by CNC.  Therefore, Murphy's agreement with Hutto does not support the notion that the demolition of the plant and other earth moving activities did not contribute to the spread of contamination throughout the Site.

In addition to his agreement with Hutto, Murphy states the following with regard to the basis of his opinion that earth moving activities would have had no effect on the extent of the contamination at the Site:

> What I can tell you is that I am not able to see any effect of the demolition on the - - of that building based on the lead to arsenic ratio in the ditches. If there had been some effect that enhanced lead, for example, I would see it in the lead to arsenic ratio in the ditches. And I don't.

[Trial Tr. 1595:10-14; *see also* Trial Tr. 1596:18-20 ("I can see no evidence of demolition-related activities in the pattern of contamination on the ground."); 1647:18-1648:2 (Murphy testifying that he had not seen any evidence of areas of excess lead contamination relative to arsenic contamination from the demolition of the lead acid chamber building); 1648:4-15 (Murphy testifying that the pattern of contamination across the Site is the same in the ditches as across the rest of the Site)].

The court afforded little weight to Murphy's opinion that earth moving activities did not affect the extent of the contamination on the Site. This is because Murphy testified that the contamination was "spotty," meaning that contamination was not uniformly found throughout the Site, [Trial Tr. 1600:10-12, 1620:15-22, 1932:20-23]; and that Murphy did not know which areas of the Site were already contaminated with pyrite slag by 1933, [Trial Tr. 1618:25-1619:16, 1617:21-1618:3; *see also* Trial Tr. 1949:19-1950:1]. These statements indicate that Murphy's opinion that the whole Site was already so contaminated by 1933 such that any subsequent earth moving activities did not affect the extent of the contamination on the Site is not reliable. Murphy also admitted that he did not inquire into the methods used by CNC to demolish the plant, indicating that he did not have knowledge of whether or not these activities affected the extent of the contamination at the Site. [Trial Tr. 1684:3-8]. Moreover, Murphy's testimony that he would expect to see evidence of excess lead contamination if the demolition of the lead acid chambers contributed to the contamination of the Site was attributed little weight because: 1) subsequent earth moving activities and the chemical migration of the contaminants would have diminished Murphy's ability

to detect a pattern; and 2) the spotty distribution of the contamination means that the mixing of soil would not invariably have shown excess lead levels in the demolition footprint of the acid chambers. The court also notes the Murphy's opinion that earth moving activities did not affect the extent of the contamination on the Site appears to be a change in opinion from that stated in his expert report, which was not explained at trial. [*See* PCS Ex. 1 at 24-25].

Ashley expert Richard A. Brown ("Brown") testified that the demolition of the plant by CNC was the most severe disturbance of soils and surface conditions on the Site. [Trial Tr. 939:2-6]. Brown stated:

> Basically my opinion, to summarize, is that there are two distribution mechanisms. One is basically physical movement of, you know, where soil moved from one location to another. And, you know, in my review of the aerial photographs . . . you know, from my review the demolition activity conducted by [CNC] represents the most extensive disturbance of soil on the [S]ite.

[Trial Tr. 842:7-14]. The court, as the finder of fact, was entitled to give the weight it deemed appropriate to all of the testimony, which is what was done. The totality of the record in this case indicates that the spread of contamination throughout the Site substantially affected the extent of contamination at the Site. [*See* Trial Tr. 1587:9-15 (Murphy testifying that the horizontal and vertical distribution of contamination throughout the Site is driving the remedy); 1943:11-15 (Murphy agreeing that the fact that contamination was mixed up with clean soil increased the volume of soil that had to be removed); 791:7-18 (Freeman testifying that man-made activities can redistribute contamination); 2070:20-24 (Grip testimony that after Planters disposed of pyrite, "the next most intense disturbance would be the excavation and grading that Holcombe and Fair conducted"). Therefore, the court reasonably determined that it was necessary for any apportionment of the costs of the remediation to take into account not only the volume of contaminants, but also

13

the spread of contamination throughout the Site.  This was appropriate pursuant to Fourth Circuit precedent. *See United States v. Monsanto Co.*, 858 F.2d 160, 173 n.27 (4th Cir. 1988) ("Volumetric contributions provide a reasonable basis for apportioning liability only if it can be reasonably assumed, or it has been demonstrated, that independent factors had no substantial effect on the harm to the environment.").

          d.     *The Court's Holding Was Not Contrary to* Burlington Northern

PCS contends that, contrary to the court's statement in its order and opinion, the rule of law from *Burlington Northern* cannot be separated from the facts of the case, which demonstrate "beyond question" that only a "rough calculation" is needed to prove divisibility.   [Entry 569-1 at 2, 7-8].  PCS also contends that the Supreme Court embraced a fifty percent margin of error for all divisibility cases.  [Entry 597 at 10, 18].  The court agrees with the basic premise that a rough calculation is all that is required to prove divisibility, so long as any rough calculation is a reasonable basis for apportioning harm.  *Burlington Northern*, 129 S. Ct. at 1881.

In *Burlington Northern*,  the district court found that the record was sufficient to apportion harm to a  railroad based upon a calculation involving three factors: 1) the railroad's ownership of only nineteen percent of the surface area of the facility; 2) the railroad's lease of their parcel of land to the polluting entity for thirteen years out of the polluting entity's twenty-nine years of operation, and 3) the fact that "the volume of hazardous-substance-releasing activities on the B&B property [, (the remainder of the property),] was at least 10 times greater than the releases that occurred on the [r]ailroad parcel, and  . . . that only spills of two chemicals [out of three polluting chemicals on the site] substantially contributed to the contamination that had originated on the [r]ailroad parcel and that those two chemicals had contributed to two-thirds of the overall site contamination requiring

14

remediation." *Burlington Northern*, 129 S.Ct. at 1882. The district court then multiplied .19 by .45 by .66 and rounded up to determine that the Railroads were responsible for approximately 6% of the remediation costs. *Id.* "Allowing for calculation errors up to 50%," the court concluded that the railroad could be held responsible for 9% of the total response cost for the site. *Id.*

The Supreme Court found that the facts in the record "reasonably supported" the district court's apportionment of liability. *Id.* at 1882-83. The Supreme Court stated:

> The District Court's detailed findings make it abundantly clear that the primary pollution at the Arvin facility was contained in an unlined sump and an unlined pond in the southeastern portion of the facility most distant from the [r]ailroads' parcel and that the spills of hazardous chemicals that occurred on the [r]ailroad parcel contributed to no more than 10% of the total site contamination, . . . some of which did not require remediation. With those background facts in mind, we are persuaded that it was reasonable for the court to use the size of the leased parcel and the duration of the lease as the starting point for its analysis.

*Id.* at 1883 (internal citations omitted). The Supreme Court noted that although the evidence in the record did not allow the district court to "calculate precisely the amount of hazardous chemicals contributed by the [r]ailroad parcel to the total site contamination or the exact percentage of harm caused by each chemical, the evidence did show that fewer spills occurred on the [r]ailroad parcel and that of those spills that occurred, not all were carried across the [r]ailroad parcel" to the sump and pond from which most of the contamination originated. *Id.* The Supreme Court also noted that: "The fact that no D-D spills on the [r]ailroad parcel required remediation lends strength to the District Court's conclusion that the [r]ailroad parcel contributed only Nemagon and dinoseb in quantities requiring remediation." *Id.* The Supreme Court's analysis indicates that it was reasonable to limit the railroad's responsibility and find that the harm in *Burlington Northern* was divisible because the evidence indicated that the primary factor affecting the remediation costs was the

15

volume of contaminants released. The case before the court is distinguishable from *Burlington Northern* because the record in this case makes clear that the spread of contamination through earth moving activities was a significant factor affecting the cost of the remediation while in *Burlington Northern*, there was no evidence that earth moving activities had significantly contributed to the extent of the contamination.

With regard to the district court's use of a fifty percent margin of error in *Burlington Northern*, the Supreme Court stated:

> The District Court's conclusion that [Nemagon and dinoseb] accounted for only two-thirds of the contamination requiring remediation finds less support in the record; however, any miscalculation on that point is harmless in light of the District Court's ultimate allocation of liability, which included a 50% margin of error equal to the 3% reduction in liability the District Court provided based on its assessment of the effect of the Nemagon and dinoseb spills. Had the District Court limited its apportionment calculations to the amount of time the Railroad parcel was in use and the percentage of the facility located on that parcel, it would have assigned the Railroads 9% of the response cost. By including a two-thirds reduction in liability for the Nemagon and dinoseb with a 50% "margin of error," the District Court reached the same result.

*Burlington Northern*, 129 S. Ct. at 1883. This quotation makes clear the Supreme Court concluded that a fifty percent margin of error was appropriate in *Burlington Northern* because it cancelled out the court's assumption that Nemagon and dinoseb only contributed to two-thirds of the contamination at the Site, which assumption did not have substantial support in the record. The Supreme Court, therefore, did not embrace a fifty percent margin of error with regard to divisibility in all CERCLA cases. Indeed, the Supreme Court's analysis indicated that based on the record in *Burlington Northern*, it was appropriate to find that the harm was divisible based on just the time period of ownership and size of the parcel because the record evidence suggested that these factors were reasonable proxies for the volume of contaminants released.

16

It is important to note that in affirming the district court's analysis in *Burlington Northern*, the Supreme Court did not move away from requiring a reasonable basis for apportionment. In addition, the court notes that interpreting *Burlington Northern* to require a reasonable basis for apportionment based upon the specific facts of a case is consistent with upholding the intent of CERCLA that taxpayers not be assessed with the costs of cleaning up environmental pollution. *Burlington Northern*, 129, S.Ct. at 1974. ("The Act was designed to promote the 'timely cleanup of hazardous waste sites' and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination.") (quoting *Consol. Edison Co. of N.Y. v. UGI Util., Inc.*, 423 F.3d 90, 94 (2d Cir. 2005)).  PCS asks that the court reconsider each of PCS's methods of apportionment to determine whether any of the methods, or any combination of methods along with the record evidence, provides a reasonable basis for apportioning the harm at the Site.

2.    Method 1

Method 1 is based upon Wayne Grip's ("Grip") calculation of the amount of fill or other material added to the Site during each PRP's ownership period.  PCS contends that the court's rejection of Method 1 is based upon a misinterpretation of Grip's analysis.  PCS contends that while aerial photography cannot identify what material added to the remediation area was contaminated, other record evidence provides a reasonable basis for assuming that virtually all of the material added to the Site was contaminated. [Entry 569-1 at 10].  PCS contends that on this basis, it is reasonable to assume that Grip's analysis roughly calculates the parties' respective responsibility for contaminated materials on the Site. [Entry 569 at 10].  PCS contends that this apportionment methodology accounts for the spreading of contaminated material across the Site because the analysis of aerial photographs captures all changes in elevation in the remediation area.  [*Id.*].  PCS

17

also contends that Method 1 is within the 50% margin of error embraced by *Burlington Northern*. [*Id.*].  In response to the court's order and opinion, PCS argues that although Grip conceded at trial that some of his calculations in his report were inaccurate, no apportionment testimony was based on these calculations.  [Entry 597 at 7].  PCS also argues that in calculating the amount of material added to the Allwaste and RHCE parcels, PCS intended that these amounts would be deducted from the contribution of the Holcombe and Fair Parties and that double counting was not intended.  [Entry 569-1 at 10].  PCS's contends that its Method 1 provides a reasonable basis for apportioning the costs of remediation. [*Id.* at 11].  The court does not agree that Method 1 provides a reasonable basis for apportionment.[2]

First, with regard to the double counting issue, the court notes that Grip did not include a determination of how much material Allwaste and RHCE contributed to the remediation in his original analysis. [Trial Tr. 2369 at 8-15].  However, Grip testified that this could be determined through a simple calculation involving the size of the parcels and the depth of the excavation.  [*Id.*].  Although PCS contends that the amounts attributed to Allwaste and RHCE were not intended to result in double counting and that these amounts could be subtracted from the allocation to the Holcombe and Fair Parties, it remains unclear whether the change in methodology is appropriate.  Grip apportions all materials to be excavated on the RHCE and Allwaste parcels to these two entities without regard to historical changes in elevation observed in aerial photography.  It is not clear that RHCE and Allwaste contributed all of the contaminated materials to be excavated on their parcels.  In addition, it is not clear whether the materials to be excavated on the RHCE and Allwaste parcels

---

[2]     PCS is correct, however, that Grip did not withdraw all of his calculations at trial.  [*See* Trial Tr. 2120:7-2121:6; 2121:22-25; 2335:17-24],

were originally attributed to the Holcombe and Fair Parties or to another party in Grip's original analysis.

Second, PCS contends, without citation to any evidence, that the record provides a reasonable basis for assuming that virtually all of the material added to the Site was contaminated. No evidence has been presented to the court indicating that "virtually all" changes in elevation identified in aerial photography involved contaminated soil that involved noncontaminated materials. [*See, e.g.* Entry 563 ¶ 67]. It was PCS's burden to show a relationship between the changes in elevation identified by Grip and the contamination. As the court previously noted, Grip's analysis does not distinguish between changes in elevation related to contamination and other changes in elevation. [*See* Trial Tr. 2102:2-6 (Grip confirming that aerial photography cannot identify whether or not material is contaminated); 2249:17-20 (aerial photography cannot detect contamination); 2250:5-8 (aerial photography cannot detect contamination)]. PCS cannot dodge its burden of proof by stating that there is no evidence of any significant fill material that was uncontaminated that would affect Grip's analysis.

Third, assuming that no significant fill of uncontaminated materials occurred, Grip's analysis is still not sufficiently related to the cause of the contamination to be a reasonable basis for apportionment. The calculations to which Grip testified at trial are based upon two significant assumptions. First, Grip's calculations assume that the contaminants on the Site would not have moved through the soil due to chemical migration, which is contradictory to the record in this case. [Trial Tr. 842:23-843:11 (Brown testifying about chemical migration of contamination)]. Second, Grip's calculations assume that Planters is responsible for all contributions to the volume of contaminants on the Site prior to 1945. [*See* Trial Tr. 2140:18-20 (Grip has no information on

whether fill was put on the Site prior to 1907); 2320:8-11 (Grip has no information on how the Site looked prior to Planters' ownership); 2322:3-7 (Grip does not have information on whether or not materials he attributes to Planters is actually material Planters put there); 2333:3-10 (Grip stating: "I can't tell you how much pyrite was placed there before or during Planters' operations."); 2331:20-2332:6 (Grip cannot rule out whether there was pyrite on the property prior to Planters' purchase); 2116:6-12 (Grip's calculations assume that "anything below the 1945 surface has to be Planters."); 2137:11-21 (Grip assuming that anything below the 1945 surface would have been Planters)]. The second assumption is significant given the large time period that Grip is unable to account for. The second assumption is not reasonable in the face of evidence that: 1) the Site had prior ownership, [*see* Entry 563 ¶ 29 (citing Ash. Ex. 72 at A 001879)]; 2) the Site would have required extensive grading and filling prior to Planters beginning operations, [Entry 563 ¶ 30 (citing PCS Exs. 4 at 2, 168), *see also* Trial Tr. 2329:23-2330:6 (Grip testifies that the Planters buildings would have required extensive filling and grading prior to construction), 2323:11-15 (Grip testifying that filling and grading were probably necessary prior to the construction of the plant)]; 3) burnt pyrite was a common fill material during the relevant time, [Ash Ex. 76 at 4 (former plant manager at CNC states that burnt pyrite was used as fill on Site for road stabilization and used to line roads in the area); Trial Tr. 1623:22 to 1624:10 (Murphy testimony that pyrite clinkers had a useful value as fill and roadbed material)]; and 4) seven other phosphate fertilizer plants were in operation from 1884 to the early 1900's in close proximity to the Site, all of which were potential sources of contaminated fill, [Entry 563 ¶ 31 (citing Trial Tr. 1665:6-10, 1564:23-1565:3; Ash. Ex. 72 at A 001879-80, A 001882-84, A 001888)]. This evidence distinguishes this case from *Burlington Northern* because in that case, there was no indication that any of contamination at issue could have come from any

20

source other than the operations of the polluting entity.

Because of these assumptions, Grip's calculations were given little weight by the court. While PCS may argue that the standard for reasonableness should take into account the lack of availability of historical information, PCS is not entitled to have the court construe the facts in its favor at trial. The fact that PCS did not present sufficient evidence that Grip's calculations are reasonably related to the harm at the Site does not mean that the court held PCS to an impermissibly high standard. The court also notes that even if Grip's calculations are accurate enough to fall within a fifty percent margin of error, the Supreme Court has not indicated that a fifty percent margin of error in apportionment calculations is appropriate in every case.

With regard to PCS's argument that Method 1 accounts for the spreading of material across the Site because the analysis of aerial photographs captures all changes in elevation in the remediation area, the court finds this argument to be without merit. The limitations of aerial photography are such that Grip could not analyze the conditions of the Site between dates of photography. [Trial Tr. 2100:8-11]. The more significant issue, however, is that changes in elevation are not necessarily related to the spread of contamination across the Site because, as previously noted, aerial photography cannot detect contamination.

3.    Method 2

PCS's second method of apportionment is based upon the volume of contaminants introduced to the Site. Using stoichiometry, Murphy sought to measure the volume of contamination added to the Site by Planters and CNC. [Entry 569-1 at 11]. In response to the court's order and opinion rejecting Method 2 as a basis for apportionment, PCS contends that Murphy's calculations were not based upon any calculations withdrawn at trial and that Method 2 is a reasonable method

21

of apportioning the harm at the Site. [Entry 569-1 at 12]. PCS further contends that there "is no evidence that pyrite slag at the Site came from any source other than Planters'[s] fertilizer operations, no reliable evidence that slag was taken off-Site, and no evidence that even were this true, it would make a bit of difference" because even if Planters discharged only half of the slag it was able to generate on-Site, it is still responsible for generating ninety-eight percent of the contamination on the Site. [Entry 597 at 3,11; Entry 569-1 at 11]. After reviewing the record, the court concludes PCS is correct that Murphy's testimony and volume calculations did not rely on calculations withdrawn at trial. Thus, the court will again consider whether Method 2 is a reasonable basis for apportioning the harm on the Site.

The starting point of Murphy's volumetric calculations was the assumption that Planters operated at full capacity. [*See* Trial Tr. 1571:15-25, 1572:18-25, 1808:25-1812]. However, Murphy also performed a check on this calculation by performing the calculation again, assuming that Planters only operated at fifty percent capacity. According to Murphy, this second calculation only changed CNC's allocation from one percent to two percent of the harm at the Site. [Trial Tr. 1812:23-1813:5]. Murphy testified that it would be reasonable to assume that Planters operated at between fifty percent and one hundred percent of its maximum capacity. [Trial Tr. 1816: 5-8]. Murphy also performed a "reality check" on his calculations in which he checked his volumetric calculations for the amount of pyrite produced by Planters with the volume of pyrite and volume of contaminated soil that he and GEL estimated are present on the Site to determine whether or not his volumetric calculations were reasonable. [Trial Tr. 1572:5-12, *see also* Trial Tr. 1573:22-1574:12. (Murphy testifying that the amount of soil that is contaminated and the degree to which it is contaminated is consistent with his volumetric calculations); 1625:9-22, 1818:1-2 (Murphy testifying

that his calculations are consistent with the GEL report as to how much material needs to be excavated); PCS ex. 2 at 2-3 ("The total volume of soil and sediments estimated by Entact to be treated is . . . 35,848 m3 . . . .   The total amount of pyrite slag and cinder generated over Planters' occupancy was estimated . . . as 46,539 m3.  Thus the planned remediation will treat a volume of material that is 35,848/ 46,539= 77% of the estimated pyrite generated from 1906 to 1933.")].

Both Murphy's volumetric calculations and the reality check" assume that Planters deposited all waste from its manufacturing operations on Site and thus is responsible for all pyrite on the Site.  Trial Tr. 1573:13-18, 1623:16-21 (volumetric calculations); 1572:5-12 (reality check).  This assumption, which was also made by Grip, is significant because of the large time period that is unaccounted for.  As was previously stated, this assumption is not reasonable in the face of evidence that: 1) the Site had prior ownership, [*see* Entry 563 ¶ 29 (citing Ash. Ex. 72 at A 001879)]; 2) the Site would have required extensive grading and filling prior to Planters beginning operations, [Entry 563 ¶ 30 (citing PCS Exs. 4 at 2, 168), *see also* Trial Tr. 2329:23-2330:6 (Grip testifies that the Planters buildings would have required extensive filling and grading prior to construction), 2323:11-15 (Grip testifying that filling and grading were probably necessary prior to the construction of the plant)]; 3) burnt pyrite was a common fill material during the relevant time, [Ash Ex. 76 at 4 (former plant manager at CNC states that burnt pyrite was used as fill on Site for road stabilization and used to line roads in the area); Trial Tr. 1623:22 to 1624:10 (Murphy testimony that pyrite clinkers had a useful value as fill and roadbed material)]; and 4) seven other phosphate fertilizer plants were in operation from 1884 to the early 1900's in close proximity to the Site, all of which were potential sources of contaminated fill, [Entry 563 ¶ 31 (citing Trial Tr. 1665:6-10, 1564:23-1565:3; Ash. Ex. 72 at A 001879-80, A 001882-84, A 001888)].  This evidence distinguishes this case from

23

*Burlington Northern* because in that case, there was no indication that any of the contamination at issue could have come from any source other than the operations of the polluting company.

Assuming that Method 2 is a reasonable volumetric calculation despite the assumption that Planters contributed all pyrite slag to the Site, Method 2 is not by itself a sufficient basis for a divisibility finding. In order for a divisibility finding to be appropriate, PCS must prove that a reasonable method that accounts for the spread of contamination across the Site also exists. This is because the spread of the contamination across the Site due to earth moving activities significantly contributed to the extent of contamination at the Site. *See Monsanto*, 858 F.2d at 173 n.27 ("Volumetric contributions provide a reasonable basis for apportioning liability only if it can be reasonably assumed, or it has been demonstrated, that independent factors had no substantial effect on the harm to the environment."). As the remainder of the court's analysis shows, PCS has not met its burden of proving by a preponderance of the evidence that a reasonable method for accounting for the spread of contamination across the Site exists.

### 4.    Method 3

PCS contends that Method 3, which apportions harm based upon the years that Planters and CNC operated the fertilizer plant is a reasonable basis for apportionment because the Supreme Court embraced this method in *Burlington Northern* even with an incomplete record of site impacts. [Entry 569-1 at 13, Entry 597 at 4]. PCS contends that production levels are not necessary because no information on production was available in *Burlington Northern*. [*Id.*]. PCS specifically contends that, contrary to the court's statement in its order and opinion, dips in Planters' production during the Great Depression are irrelevant because a fifty percent reduction in Planters' operations would reduce its share of liability only one percent and a fifty percent margin of error was embraced in

24

*Burlington Northern*. [Entry 569 at 13]. PCS further contends that "[t]he idea that this methodology must account for spreading disregards the fact that contamination was dispersed across the site at issue in *Burlington Northern* and that did not prevent the Court from finding this apportionment method reasonable." [Entry 569-1 at 13].

The court does not agree that apportionment based solely upon the amount of time Planters and CNC each operated the plant is reasonable in this case. Contrary to PCS's contention, the *Burlington Northern* case did not embrace apportioning harm based upon periods of operations in all cases. Instead, the Supreme Court found that the district court's use of this information was appropriate as a "starting point for its analysis" based upon factual findings that

> ma[d]e it abundantly clear that the primary pollution at the . . . facility was contained in an unlined sump and an unlined pond [on a] portion of the facility most distant from the Railroads' parcel and that the spills of hazardous chemicals that occurred on the Railroad parcel contributed to no more than 10% of the total site contamination, some of which did not require remediation.

*Burlington Northern*, 129 S.Ct. at 1182.

There are significant differences between *Burlington Northern* and the case before the court that indicate that apportionment based upon periods of operations is inappropriate in this case. First, in *Burlington Northern*, only one company conducted the operations leading to the contamination, making it more reasonable to assume that contamination occurred at reasonably constant levels over time. Such an assumption is not appropriate based upon the record of this case. In this case, two different companies, Planters and CNC, conducted operations at the Site and there is evidence indicating that these companies did not uniformly dispose of manufacturing byproducts on the Site. [Ash. Ex. 76 at 4]. At times during Planters' ownership period, pyrite cinders from the Site were used to line roadbeds in the area. [Ash Ex. 76 at 4 ]. In addition, CNC's operations differed from

25

those of Planters. [Trial Tr. 1492:21-23, 1524:12-13, 1481:2-12, 1850:1-15].  Second, unlike in *Burlington Northern*, the evidence in this case does not place the bulk of the contamination on a part of the Site far away from CNC's or Planters's operations.  Third, in *Burlington Northern*, there was no evidence that earth moving activities such as grading, filling, and demolition substantially affected the extent of the contamination on the site as is the case here.  *See Atchison*, 2003 WL 25518047, at ¶ 479 (cited by PCS because it states that the site was graded towards a waste pond, but giving no indication that grading took place after contamination was disposed of on the site or through contaminated soils).  Based upon the foregoing, the court concludes that Method 3 is not a reasonable basis for apportioning the harm in this case.

     5.    Method 4

PCS contends that its Method 4, which is based upon Grip's area of first impact analysis, is a reasonable basis for apportionment.  [Entry 569-1 at 13-14].  PCS contends that the fact that this apportionment method does not account for contamination volume or spreading does not make it unreasonable because the six percent share of responsibility that this method apportions to CNC is consistent with the calculations in PCS's Methods 1 and 2. [*Id.* at 13].

In its opinion, the court gave three reasons for its determination that Method 4 is not a reasonable basis for allocation.  First, the court noted that Method 4 fails to take into account the original sources of the contaminants, which is one of the driving factors of the remediation.  The court recognizes, however, that this reason does not by itself indicate that Method 4 is not useful in apportioning the harm at the Site.  If Method 4 were a reasonable method of determining the spread of contamination throughout the Site, it might be combined with an appropriate volumetric analysis to apportion the harm at the Site.  However, the second two reasons the court gave for discounting

Method 4 indicate that Method 4 is not a reasonable basis for accounting for the spread of contamination through the Site.

The court's second reason for discounting Method 4 was that aerial photography cannot be used to determine when contaminants were moved across the Site, and can only show when earth moving activities took place. [*See* Trial Tr. 2157:18-2158:10 (Grip testifying that the area of first impact method is related to disturbances of soil and is not directly related to contamination)]. Therefore, this method does not have a reasonable relationship to the amount of contaminated soil at the Site.

The court's third reason for discounting Method 4 was that the area of first impact does not take into account the total volume of soil affected by earthmoving activities. The court specifically noted that Method 4 does not take into account subsequent, more invasive, earth moving activities in an area where earth moving has already occurred. This means that any allocation based upon Method 4 involves a substantial risk that the wrong PRP will be held liable for contamination. This point is illustrated by Grip's testimony. [Trial Tr. 2305:14-18 ("Yes, because this exercise simply shows the first time that in the photography a tract of land was disturbed by one of the periods of ownership. Just so happened that [CNC] operated on areas that have already been disturbed for the most part by Planters."); 2294:25-2295:3 ("It may have been impacted by Planters prior to the first date of aerial photography. I can't rule that out. But the first visual impact that I see to that area is during the Holcombe and Fair period."); 2320:16-20 ("Okay. And when you're talking about areas of first impact, you're also not telling us that Planters was the only one that had any impact in that area; correct? Correct. I'm just identifying the areas of first impact as detected in the aerial photography.")]. Moreover, Grip implied at trial that Method 4 is not a good method for

apportioning the harm at the Site. [*See* Trial Tr. 2306:11-12 ("I don't know that I would recommend using it by itself, that's right."); 2158:8-10 ("I'm not recommending that you use that as a measurement all by itself, however.  That just one of the - - one of the clues to unraveling the puzzle.")].  Therefore, the court concludes that Method 4 is not a reasonable basis for apportioning harm at the Site.

      6.   <u>Method 5</u>

PCS's fifth method of allocation is based upon the number of contaminated soil samples taken by GEL that Stout attributed to CNC, and that Murphy attributed to Allwaste, RHCE, and the Holcombe and Fair Parties; divided by the total number of contaminated soil samples taken by GEL. Stout testified that it would be reasonable to determine CNC's contribution to the contamination on the Site based upon the contaminated soil samples that Stout attributed to CNC.  [Trial Tr. 1136:10-23]. In its order and opinion, the court determined that Method 5 was not a reasonable basis for apportioning harm at the Site because: 1) the number of contaminated soil samples that Stout attributed to CNC was not reasonably related to the volume of contaminated soil on the Site; and 2) there was no evidence that apportionment based upon the percentage of soil samples attributed to each PRP was a reasonable basis for apportioning the volume of contaminated soil at the Site.

PCS contends that the court's reasons for discounting Method 5 overlook testimony and documents indicating that EPA and GEL used soil sample locations to estimate the volume of contaminated material that needs to be removed from the Site. [Entry 569-1 at 14].  PCS further contends that Method 5 expressly addresses contaminant spreading, and that Method 5 provides a reasonable basis for apportionment. [Entry 597 at 4].

There are a number of problems with Method 5.  First, it should be noted that Stout's

testimony that Method 5 is a reasonable way to divide up the harm at the Site is not dispositive because whether or not a method of apportionment is reasonable is a determination to be made by the court.  Second, although EPA and GEL did use soil samples to estimate the volume of contaminated soil, the simple division of soil samples attributed to each PRP by the total number of contaminated soil samples is not an appropriate method of apportionment.  This is because how the EPA and GEL made their volume calculation is unclear.  [*See* Trial Tr. 641:8-21 (Freeman testimony that an isoconcentration map shows the contours of concentration levels of a given contaminant between data points); Ash. Ex. 93 at Figs. 2-1, 2-2 (Final Feasibility Study conducted by Black and Veatch for the EPA showing isoconcentration maps); PCS Ex. 22].  What is clear is that the EPA and GEL's estimates of contaminated soil were not obtained through a simple attribution of a certain amount of soil per soil sample.  *See* PCS Ex. 22 at 14 ("Contaminant mass for the sample area was estimated in 1 foot increments from 0 to 5 feet bls using data from the appropriate sample interval. . . .  The area for each concentration contour was estimated and the corresponding volume (1-foot soil increment) was calculated.  The soil mass was then calculated (1 cubic yard = 1.5 ton) and the lead and arsenic mass was estimated using the median concentration value for the specified contour interval."); Ash. Ex. 93 at A01_06771 ("Information concerning the nature and extent of contamination in soil, groundwater and marsh sediment was used to estimate the volume of contaminated media that would need to be remediated.").  Therefore, division of the number of soil samples attributed to each party by the number of contaminated soil samples does not bear a reasonable relationship to the estimated volume of contaminated soil.

Third, the grid pattern of sampling used by GEL was not consistent such that every sample could be assumed to be worth the same amount of contaminated soil mass. [PCS Ex. 22 at 9 ("A

50-foot sampling grid was established over the most highly contaminated areas. . . . A 100-foot sampling grid was established over the remainder of the [S]ite. . . .")].  This further indicates that Method 5 does not bear a reasonable relationship to the volume of contaminated soil at the Site. Fourth, Stout's allocation of soil samples to CNC is suspect due to the limited information that may be obtained from aerial photography.  Stout was not able to determine whether or not any earth moving activities occurred in between the dates of photography and was not able to determine whether or not the earth moving activities that she did detect resulted in the spread of contamination. [*See* Trial Tr. 1099:22-1098:25 (Stout testifying that she cannot determine from aerial photography whether or not slag has been placed and redistributed); *see also* Trial Tr. 1100:11-17; 1203:14-23]. Fifth, the allocation of samples presented by PCS in Method 5 involves the double counting of two samples, making Method 5 unreliable as a basis for apportionment.  Specifically, Murphy attributed contamination at sample 555 to both the Holcombe and Fair Parties and RHCE.  [*See* Trial Tr. 1455:16-1456:11; 1457:5-9].  In addition, sample 415 is attributed to CNC by Stout and to the Holcombe and Fair Parties by Murphy. [*Cf.* Ash. Ex. 226 at 19 and Trial Tr. 1456:9].  Method 5 is not a reasonable basis for apportionment of the harm at the Site.

### 7.    Conclusion

The court declines to make a divisibility determination without a reasonable basis for apportionment.  *See Burlington Northern*, 129 S. Ct. at 1881 (citing Restatement (Second) of Torts § 433A, cmt i. at 440 (1963-1964)) (when two or more causes produce a single, indivisible harm, "courts have refused to make an arbitrary apportionment for its own sake, and each of the causes is charged with responsibility for the entire harm.").

30

**B.      Planters-CNC Indemnification Agreement**

PCS argues that the Planters-CNC indemnification agreement bars Ashley from holding PCS liable for response costs allocated to Ross, and allows PCS to recover some of its costs from Ross. PCS contends that the indemnification agreement must be treated separately from the court's equitable allocation because PCS's contract claim against Ross is not duplicative of PCS's CERCLA contribution claim.  [Entry 569-1 at 23].  The court will analyze the indemnification agreement to determine its effect on the court's allocation of harm.

1.      Whether the Planters-CNC Indemnification Agreement is in Effect

PCS contends that the Planters-CNC indemnification agreement ("Indemnification Agreement") is in effect because: 1) the parties expressly provided that the Indemnification Agreement would remain in effect after closing; and 2) the Indemnification Agreement is unqualified in that it reaches all of the assets in the transaction between Planters and CNC. [Entry 569-1 at 21]. PCS also contends that because the deed transferring the Site from Planters to CNC only partially performed the provisions in the January 7, 1996 Letter of Agreement ("Letter of Agreement"), the Letter of Agreement, which contains the Indemnification Agreement, was not merged into the deed at closing. [Entry 596 at 4].  Ross contends that because the deed does not contain or incorporate the Indemnification Agreement, and the Bill of Sale that incorporates the Indemnification Agreement specifically excludes the land, PCS is not entitled to indemnification from Ross. [Entry 578 at 1-3].

"The cardinal rule of contract interpretation is to ascertain and give legal effect to the parties' intentions as determined by the contract language." *Beaufort Cnty. Sch. Dist. v. United Nat. Ins. Co.*, No. 4794, 2011 WL 692226, at *3 (S.C. Ct. App. Feb. 23, 2011) (citing *Schulmeyer v. State Farm Fire & Cas. Co.*, 579 S.E.2d 132, 134 (S.C. 2003)).  "If [a] contract's language is clear and

31

unambiguous, the language alone, understood in its plain, ordinary, and popular sense, determines the contract's force and effect." *Id.* (citing *Schulmeyer*, 579 S.E.2d at 134). Only when a contract is ambiguous may extrinsic evidence be admitted to aid interpretation. *Rhame v. Nat'l Grange Mut. Ins. Co.*, 121 S.E.2d 94, 97 (S.C. 1961). Whether a contract's language is ambiguous is a question of law. *S.C. Dep't of Natural Res. v. Town of McClellanville*, 550 S.E.2d 299, 302-03 (S.C. 2001). A contract is ambiguous "only when it may fairly and reasonably be understood in more ways than one." *Hansen v. United Servs. Auto. Assoc.*, 565 S.E.2d 114, 117 (S.C. Ct. App. 2002).

Generally speaking, the merger by deed doctrine provides that "a deed made in full execution of a contract of sale of land merges the provisions of the contract therein. . . ." *Charleston & W. Carolina Ry. Co. v. Joyce*, 99 S.E.2d 187, 193 (S.C. 1957). "[T]his rule extends to and includes all prior negotiations and agreements leading up to the execution of the deed." *Id.*; *see also Wilson v. Landstrom*, 315 S.E.2d 130, 133 (S.C. Ct. App 1984) ("A deed executed subsequent to the making of an executory contract for the sale of land supersedes that contract. . . .") (citing *Charleston & W.*, 99 S.E.2d at 187).

There are two exceptions to the merger by deed doctrine. First, if a deed "constitutes only part performance of a preceding contract, other distinct and unperformed provisions of the contract are not merged in the deed." *New Prospect Area Fire Dist. v. New Prospect Ruritan Club*, 429 S.E.2d 791, 792 (S.C. 1993) (citing 26 C.J.S. Deeds § 91 (1956)). Second, agreements that are not intended to be merged in a deed, are also not merged into the deed. *Hughes v. Greenville Country Club*, 322 S.E.2d 827, 828 (S.C. Ct. App. 1984) (citing *Charleston & W.*, 99 S.E.2d at 193)). Under the second exception, "the party denying merger has the burden of proving by clear and convincing evidence that merger was not intended." *Hughes*, 322 S.E.2d at 828 (citing *Knight v. Hedden*, 146

S.E.2d 556, 558 (Ga. Ct. App. 1965)).

In the Letter of Agreement, Planters agreed to sell its business to CNC and promised to indemnify CNC. [PCS Ex. 276]. The Letter of Agreement contains sixteen terms and conditions involving such topics as obtaining board approval of the sale by CNC, maintenance of adequate insurance, continuance of operations, indemnification, covenants not to compete, and termination of employment relationships with employees. [*Id.* ¶ I, IV, VII, VIII, X, and XII]. The Letter of Agreement's indemnification provision states:

> Seller [Planters] agrees to indemnify and hold harmless Buyer [CNC] in respect to all acts, suits, demands, assessments, precedings and cost and expenses resulting from any acts or omission of the Seller [Planters] occurring prior to the closing date and pertaining herein, provided the Seller [Planters] receives prompt notice in writing of such claim or demand and Seller [Planters] shall have the right to litigate or contest such claim.

[PCS Ex. 276 at 10 ¶ VIII]. The Letter of Agreement also states: "the sale, conveyance and transfer of the assets of the business of the Seller [Planters] which are to be transferred to the Buyer [CNC], shall be effected by Deed, Bill of Sale, and other instruments of transfer and conveyances in such form as the Buyer [CNC] shall reasonably request." [*Id.* at 4, ¶ V].

On June 30, 1966, the Planters plant and equipment were transferred from Planters to CNC by way of a Bill of Sale. [PCS Ex. 15]. The real estate on which the plant was located was transferred through a deed on the same date. [Ash. Ex 23]. The deed did not explicitly incorporate the Letter of Agreement or the Indemnification Agreement. [*See id.*] However, the Bill of Sale states:

> It is the intention of the Seller by this instrument to fully and effectually implement its obligation to deliver to the Buyer certain tangible personal property **and interest in certain real and personal property** pursuant to a certain Letter of Agreement dated January 7, 1966, as supplemented by a letter dated March 31, 1966, and it is

> accordingly declared that the Letter of Agreement above referred to as so supplemented, shall survive the execution and delivery of this Bill of Sale, so that it shall be the continuing obligation of the Seller to execute and deliver such further instruments of conveyance and assurance as may be required in order that the Seller shall faithfully and fully implement its obligation above referred to.

[PCS Ex. 15 ¶ VIII (emphasis added)].  Because the Letter of Agreement clearly contains provisions that are not addressed in the deed or performed by the deed, the doctrine of merger by deed is inapplicable.  In addition, the language of the Bill of Sale that incorporates the Letter of Agreement explicitly mentions the sale of real property, not just the plant and equipment, indicating that the Indemnification Agreement is applicable to the land.  Based upon the foregoing, the court finds that the indemnification agreement between Planters and CNC remains in effect.

2.     Effect of the Indemnification Agreement

a.     *PCS is Entitled to Payment of Some Costs by Ross*

PCS contends that the court should find that the Indemnification Agreement requires Ross to reimburse PCS for the costs of this litigation that arise from Ross' acts and omissions.  [Entry 569-1 at 23].  PCS contends that these costs include litigation costs incurred by PCS to date to identify Ross as a liable party and to bring Ross into this litigation.  [*Id.*].

As a preliminary matter, the court finds that the broad language of the indemnification agreement, which covers "all acts, suits, demands, assessments, precedings and cost and expenses resulting from any acts or omission of the Seller [Planters] occurring prior to the closing date," encompasses CERCLA claims.  *See Joslyn Mfg. Co. v. Koppers*, 40 F.3d 750, 754 (5th Cir.1994) (holding that broad language in indemnity clauses indicated that the agreements were intended to cover all forms of liability, including liability under CERCLA, even though environmental liability under CERCLA was not contemplated at the time of contracting); *Kerr-McGee Chem. Corp. v.*

34

*Lefton Iron & Metal Co.*, 14 F.3d 321, 327 (7th Cir. 1994) (recognizing that a party may contract to indemnify another for environmental liability even though CERCLA was not in existence at the time of contracting); *Vill. of Fox River Grove v. Grayhill, Inc.*, 806 F. Supp. 785, 792 (N.D. Ill. 1992) (holding that a general release between a CERCLA plaintiff and a third-party defendant, which was entered into prior to the enactment of CERCLA, barred third-party contribution claims); *Jones-Hamilton Co. v. Kop-Coat, Inc.*, 750 F. Supp. 1022, 1026-27 (N.D. Cal. 1990) (holding that an indemnification agreement that encompassed "all losses, damages and costs" resulting from any violation of law was sufficient to release the indemnitee from CERCLA liability even though the agreement was entered into prior to the enactment of CERCLA and did not specifically mention CERCLA).  In addition, based upon the plain language of the Indemnification Agreement, the court finds that Ross must reimburse PCS for the costs and expenses of this case resulting from any acts or omissions that occurred "prior to the closing date" of the sale of the Planters business to CNC. [*See* PCS Ex. 276 at 10 ¶ VIII].

     b. *The Indemnification Agreement Does Not Bar Ashley from Holding PCS Liable for Ross's Equitable Share of the Harm at the Site*

    PCS contends that the Indemnification Agreement prevents any entity from recovering from PCS any response costs allocated to Ross, including part of any orphan share, because PCS has been released from such claims and indemnified from such costs. [Entry 569-1 at 20].  The court disagrees.

    As the court stated in its order and opinion, CERCLA permits parties to shift the burden for paying response costs through contractual agreements.  *See* 42 U.S.C. § 9607(e)(1) ("Nothing in [CERCLA § 107(e)(1)] shall bar any agreement to insure, hold harmless, or indemnify a party to

such agreement for any liability under [CERCLA § 107]."). The court also stated that an individual or entity that settles with a CERCLA plaintiff before final judgment is not liable for contribution to others for the injury. Restatement (Third) of Torts § 23 cmt i. However, this principle does not apply to indemnification agreements among joint tortfeasors.

Generally speaking, when two or more parties have engaged in tortious conduct that is a legal cause of indivisible harm each joint tortfeasor can be held liable for the entire harm. Restatement (Second) of Torts § 875. A plaintiff then has the right to decide which joint tortfeasor(s) to sue for recovery. *Chester v. S. Carolina Dept. of Pub. Safety*, 698 S.E.2d 559, 560 (S.C. 2010) (citing *Doctor v. Robert Lee, Inc.*, 55 S.E.2d 68 (1949)). The affect of a contractual indemnification agreement among joint tortfeasors, does not affect a plaintiff's right to decide which joint tortfeasor(s) to sue. Instead, a contractual indemnification agreement among joint tortfeasors allows the indemnitee tortfeasor to recover from the indemnitor tortfeasor. *See First Gen. Servs. of Charleston, Inc. v. Miller*, 445 S.E.2d 446, 449 (S.C. 1994) ("Indemnity is that form of compensation in which a first party is liable to pay a second party for a loss or damage the second party incurs to a third party.'") (quoting *Winnsboro v. Wiedeman-Singleton, Inc.*, 398 S.E.2d 500 (S.C. Ct. App.1990)); *see also McCain Mfg. Corp. v. Rockwell Intern. Corp.*, 695 F.2d 803 (4th Cir. 1982) (finding that in South Carolina, if a joint tortfeasor could prove that it had a contractual indemnification agreement with another joint torfeasor, it would be able to recover from the other joint tortfeasor for damages paid to a harmed party). With regard to PCS's claim that it cannot be apportioned any part of any orphan share left by Ross due to the Planters-CNC indemnification agreement, any ruling on this issue would be speculative until such time as an orphan share is established. Therefore, the court declines to address PCS's claim at this time.

3.    Sharing the Costs of Pursuing Claims Against Ross

PCS argues that as an equitable matter, both Ashley and RHCE should bear a proportional share of the costs incurred by PCS's enforcement efforts against Ross. [Entry 569-1 at 24]. PCS contends that it seeks to recover only costs that arise from work that will benefit all of the parties and the entire Site by ensuring that funds are available to pay for the remediation. PCS contends that a recovery of this type of cost has been approved by the Supreme Court and is appropriate here. [Entry 598 at 4-5]. Therefore, PCS asks that the court use its equitable allocation power to reduce its share of liability based on the fact that PCS alone is expending funds to establish whether or not Ross' share of liability is an orphan share. [Entry 598 at 3]. Ashley argues that PCS's request is inappropriate as beyond the scope of Rule 59(e). Ashley also contends, as does RHCE, that attorney's fees are not recoverable response costs under CERCLA.

Section 107(a) of CERCLA provides that responsible parties are liable for "any . . . necessary costs of response incurred by any other person consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B). CERCLA § 101(25), as amended, provides that "response" or "respond" "means remove, removal, remedy, and remedial action" and that "all such terms (including the terms 'removal' and 'remedial action') include enforcement activities related thereto." 42 U.S.C. § 9601(25).

In *Key Tronic Corp. v. United States*, 511 U.S. 809, 819 (1994), the Supreme Court held that CERCLA § 9607 "does not provide for the award of private litigants' attorney's fees associated with bringing a cost recovery action." *Id.* at 819. However, the Supreme Court noted that some attorney's fees could be recovered if they are "closely tied to the actual cleanup" because they may constitute a necessary cost of response." *Id.* at 820. The Supreme Court specifically held that work

performed identifying other PRP's falls into the category of recoverable attorney's fees because "[t]racking down other responsible solvent polluters increases the probability that a cleanup will be effective and get paid for." *Id.* However, the Supreme Court found that attorney's fees for legal services performed in connection with negotiations between Keytronic and the EPA were not recoverable because although the negotiations may have aided the cleanup, this work was primarily done to protect the Keytronic's interests as a defendant in the proceedings. *Id.* at 820.

In *Keytronic*, the Supreme Court essentially categorized attorney's fees into two groups: 1) traditional expenses of litigation and those incurred to protect a defendant's interests in proceedings that established the extent of its liability; and 2) expenses that increase the probability that cleanup will be effective and paid for, and that serve a statutory purpose other than the reallocation of costs. Although PCS contends that its enforcement efforts against Ross are aimed at establishing whether or not Ross's share of liability is an orphan share, the primary reason PCS is pursuing Ross is to collect on its contribution judgment against Ross. Although PCS's efforts will aid the cleanup to some extent, these efforts are primarily aimed at protecting PCS's interests in this action. In addition, as an equitable matter, the court finds that it would be inappropriate to reduce PCS's equitable share of liability based upon the costs it is incurring to enforce its judgment against Ross as this would go against Ashley's right as the plaintiff in a joint and several liability case to choose which joint tortfeasor to sue for recovery. *See United States v. Occidental Chem. Corp.* 200 F.3d 143, 147 (3d Cir. 1999) ("EPA may sue one or all of the PRPs involved at a given site, as each PRP is jointly and severally liable for all response costs that are 'not inconsistent with the national contingency plan.'") (quoting 42 U.S.C. § 9607(a)(4)(A)); *see also Chester*, 698 S.E.2d at 560 (A plaintiff has the right to decide which co-tortfeasor(s) to sue for recovery).

IV.    **Ross's Motion to Amend or Modify Findings of Fact and Conclusions of Law**

As a general matter, Ross requests that the court clarify that it did not intend to make findings of fact or conclusions of law that would be determinative in other pending lawsuits. [Entry 597 at 4]. This request is not appropriate.

Ross's request for clarification does not fall within the limited bounds of Rule 59(e) as it does not involve a change in controlling law, new evidence, or a clear error of law or manifest injustice. In addition, the extent to which the court's findings and conclusions may have preclusive effects in other pending cases is an issue to be determined in those other cases. Any comment on this issue by the court at this time would constitute an advisory opinion. *See FCC v. Pacifica Found.*, 438 U.S. 726, 735 (1978) (federal courts are not empowered to give advisory opinions). Indeed, it is not clear whether issue or claim preclusion would apply in related cases as both doctrines have specific requirements that must be met.

Ross also seeks amendments to several of the court's findings of fact. First, Ross seeks amendment of factual finding number 45. [Entry 567 at 5]. Factual finding number 45 currently states:

> The Board of Directors of Ross ("Ross Directors") knew that the Site was contaminated at least as early as 1992 when an article appeared in a Charleston paper regarding the listing of the Koppers Superfund Site on the National Priorities List. [Trial Tr. 2916:[19]-2917:12; PCS Ex. 261]. One of the Ross Directors, Katherine Rike ("Rike"), understood from the article that the entire Neck Area in Charleston, South Carolina, including the Site, was contaminated. [Trial Tr. 2916:[19]-2917:12]. Another director, Mr. Carter ("Carter") clipped out the article and placed it in a file entitled "Special Directors Meeting." [Trial Tr. 2984:20-2985:1]. On January 31, 1992, the Special Directors Meeting was held in part to discuss a potential environmental liability claim against Ross. [Trial Tr. 2981:21-2982:18]. At that meeting, Carter was authorized by the Ross Directors to consult with an environmental attorney. [Trial Tr. 2987:11-14].

[Entry 563 ¶ 45]. Ross contends that the finding could lead to the misperception that the Ross directors knew from the 1992 article about the specific contamination at issue on the Site in this case.

[Entry 567 at 5]. Ross proposes that factual finding number 45 be amended to read:

> **One of the members of** the Board of Directors of Ross ("Ross Directors") knew that **land adjoining** the Site was contaminated at least as early as 1992 when an article appeared in a Charleston paper regarding the listing of the Koppers Superfund Site on the National Priorities List. [Trial Tr. 2916:32- 2917:12; PCS Ex. 261]. One of the Ross Directors, Katherine Rike ("Rike"), understood from the article that the entire Neck Area in Charleston, South Carolina, including the Site, was contaminated. [Trial Tr. 2916:32-2917:12]. **The article did not specifically address the Planters/Columbia Nitrogen Site nor contamination from lead or arsenic. [PCS Ex. 261].**

[Entry 567 at 2]. The court declines to make the requested amendment because the court's finding has a basis in the record, and the request is not based upon new evidence and would not prevent manifest injustice.

Ross seeks an addition to factual finding number 51. [Entry 567 at 6]. Factual finding number 51 currently reads: "Ross filed its Articles of Dissolution on September 13, 2006. [PCS Ex. 177; Ross Ex. 6]." [Entry 563 ¶ 51]. Ross seeks to add the following sentence: "The evidence reflects that the dissolution of Ross was procedurally proper. [Trial Tr. 2951:7-14; PCS Ex. 177; Ross Ex. 6]." [Entry 567 at 3]. The court declines to make this addition because such a finding is not necessary to the court's ruling.

Ross seeks to amend factual finding number 52 to indicate that Katherine Rike was not aware of PCS's claim against Ross until sometime in late December 2006 or January 2007, instead of in November 2006 as was found by the court. [Entry 567 at 3]. The court declines to make the requested change. In making its finding, the court weighed all of the evidence in the record and made a reasonable conclusion. [*See* Trial Tr. 2932:3-5].

Ross seeks an amendment to factual finding number 54, which reads:

Ross has filed a declaratory judgment action in South Carolina state court against Fireman's Fund Insurance Company and United States Fire Company, both of which have denied Ross insurance coverage for any liability related to the contamination at the Site. [PCS Ex. 183]; *see Ross Dev. Corp. v. Fireman's Fund Ins. Co.*, 2008-CP-10-5524. This case was subsequently removed to federal court. *Ross Dev. Corp. v. Fireman's Fund Ins. Co*, 2:08-CV-03672-MBS.

[Entry 563 ¶ 54].  Ross seeks the following addition:

Ross has filed … Ross Dev. Corp. v. Fireman's Fund Ins. Co, 2:08-CV-03672-MBS. **In addition, PCS has sued some of the former Ross shareholders under South Carolina's dissolution statute for disgorgement of certain distributions in PCS Nitrogen, Inc. v. Buhrmaster et al., 2008-CP-10-5269, pending in the S.C. Court of Common Pleas; and in PCS Nitrogen, Inc. v. Ross Dev. Corp., 2:09-CV-03171-MBS, pending before this Court, PCS has sued the former Ross Directors alleging claims for fraudulent conveyance, civil conspiracy, and breach of fiduciary duty.  The findings of fact and conclusions of law in this Order are not intended to express a legal conclusion or a finding of fact regarding the propriety of, or the ultimate disposition of, any facts, claims, defenses, or other matters in these other pending lawsuits.**

[Entry 567 at 3]. The court declines to make this addition.  First, reference to the other related suits brought by PCS in this factual finding is unnecessary as the court references these cases in a footnote of the order and opinion.  Second, as previously discussed, the court declines to issue an advisory opinion on the preclusive affect of its findings of fact and conclusions of law.

Finally, Ross seeks the deletion of the following sentence from the court's order: "In addition, the court finds that the existence of any orphan share is irrelevant for the purposes of allocation in light of evidence that Ross took steps to make itself judgment proof."  Ross contends that this sentence could be perceived as a determination of wrongdoing that could be binding in the other lawsuits, although the facts have not been fully developed.  [Entry 567 at 8].  Ross contends that the sentence creates an ambiguity with respect to whether or not the Court is making a finding

of fact within this conclusion, which could be binding in the other litigation particularly because the court does not use the qualifying word "suggests" as it does on the following page of the order and opinion. [*Id.*]. As previously discussed, the court will not at this time address the preclusive effect that any of its findings of fact and conclusions of law may have in other cases as this would result in an advisory opinion. However, the court will add the word "suggests" to the sentence identified by Ross to clarify that the court did not intend to make a finding of fact in its conclusions of law.

## V.    Holcombe and Fair Parties' Motion to Amend

The Holcombe and Fair Parties seek amendments to the court's factual findings 92 and 93 to clarify that E.M. Seabrook, Jr. ("Seabrook") was hired to plan the Milford Street extension, but not to perform the construction. [Entry 570 at 3]. Findings 92 and 93 state:

> 92.    In the summer of 1990, Holcombe and Fair began constructing the Milford Street extension. [Trial Tr. 2796:1-19]. Holcombe and Fair paid for the extension of Milford Street. [Trial Tr. 2656:10-2557:9]. The City did not contribute to the payment of these expenses. E.M. Seabrook Jr., Inc., a local engineering and surveying company, was hired by Holcombe and Fair to plan and construct the Milford Street extension. [Trial Tr. 2598:13-22, 2682, 2687:6-8]. The construction for the Milford Street extension included the addition of underground water and sewer lines as well as a drainage ditch. [Trial Tr. 2494:12-2495:3, 2582:19-22, 2598:7-25, 2681:23-2682:7, 2685:6-18, 2695:6-2698:14]. These plans were approved by the South Carolina Coastal Council. [PCS Exs. 79, 80, 83, 84, 155, 157, 165; Holcombe and Fair Parties Ex. 2].

> 93.    To construct the Milford Street extension, Seabrook used a bulldozer to level and smooth the the land. [Trial Tr. 1128:17-1129:6, 2694:14-2696:3, 2699:1-18; PCS Ex. 157]. By the end of the summer of 1990, the Milford Street extension was roughed in. [Trial Tr. 2796:1-19]. ROC was put down as base material with asphalt placed on top. [Trial Tr. 1128:17-1129:6, 2494:12-2495:22, 2694:14-2696:3, 2699:1-18; PCS Ex. 157]. A turnaround was constructed at the end of the road extension, but was left unpaved. [PCS Ex. 157; Trial Tr. 2686:12-25, 2780:5-8]. The water and sewer utility extensions were constructed by excavating soil adjacent to the road extension, placing utility pipe in the excavated trench, backfilling the trench

with soil removed from the trench, and spreading any excess dirt in the immediate area of the excavation. [PCS Ex. 157; Trial Tr. 2696:4-2697:2]. The water line extension was placed on one of the road shoulders at an elevation of approximately three feet deep. [Trial Tr. 2731:15-16]. The sewer line was placed on the other road shoulder at a depth of 4.5 feet. [Trial Tr. 2731:2-14]. A drainage ditch approximately two feet in depth and ten feet wide was constructed along the road extension and along the turnaround. [PCS Ex. 157; PCS Ex. 166 at PCS-0016120; City Ex. 17 at 6; Trial Tr. 2686:12-25, 2697:3-12, 2746:23-2747:22]. The final portions of the water and sewer lines were installed in 1996. [PCS Ex. 259 at HF0001249; PCS Ex. 101]. The construction of the road, ditch, and utility lines proceeded through areas with discolored soils. [PCS Ex. 126; Trial Tr. 422:6-9, 2800:18-25].

[Entry 563 at ¶¶ 92-93]. The court agrees that the record indicates that Seabrook was hired to design and supervise the construction of the Milford Street extension, but not to perform the construction himself. Pursuant to Rule 52(b), the court will revise its factual findings to more precisely indicate Seabrook's role in the construction of the Milford Street extension.

The Holcombe and Fair Parties seek amendments to the court's order to reflect that Arcadian, PCS's predecessor, provided GEL's draft report to the EPA on or about June 16, 1994 in response to a formal request for information from EPA under CERCLA § 104, 42 U.S.C. § 9604. [Entry 570 at 4]. The Holcombe and Fair Parties further seek a factual finding that the Holcombe and Fair Parties provided GEL's final report to DHEC sometime before 1996. [Entry 570 at 4-5]. The court's finding of fact number 106 reads: "On January 23, 1991, an attorney for Arcadian Corporation responded to Warner's letter regarding the contamination at the Site denying responsibility. [Ash. Ex. 56]. Arcadian subsequently provided EPA with a copy of GEL's draft report. [Ash. Ex. 62]." The court will amend finding of fact 106 to specify that Arcadian provided GEL's draft report to the EPA in response to a request for information because this fact is supported by the record. However, the court declines to find that the Holcombe and Fair Parties provided GEL's final report to DHEC

before 1996 as this finding is not supported by the Holcombe and Fair Parties' citations to the record.

The Holcombe and Fair Parties seek clarification of finding of fact 107 to reflect that the information provided to Robin W. Hood, II ("Hood") in 1991 was information regarding the Commissioner of Public Works property, which was adjacent to the property owned by the Holcombe and Fair Parties. [Entry 570 at 5]. RHCE joins in this request. [Entry 585 at 4]. The court agrees that the requested clarification is appropriate, and pursuant to Rule 52(b) will adjust finding of fact 107 accordingly.

The Holcombe and Fair Parties request an amendment to finding of fact 131, which states in pertinent part: "The ROC on the Site may be contaminated above remediation levels." [Entry 570 at 6]. The Holcombe and Fair Parties contend that there is no evidence that the ROC on the Site is contaminated, and ask that the court amend its order to the extent that the court's finding affected the court's allocation of liability. [*Id.*, Entry 593 at 3]. RHCE joins in this request. [Entry 585 at 4]. The court declines to make the requested clarification. The court's finding does not indicate that the ROC *is* contaminated, but that it *may* be contaminated. The record does not contain sampling data that allows the court to conclusively determine whether or not the ROC is contaminated. [*See* Trial Tr. 1442:2-9]. In addition, the court's finding that the ROC may be contaminated did not factor into the court's allocation of liability, instead, the court considered the ROC to be an overall benefit to the Site. [*See* Entry 563 at 89, 91].

The Holcombe and Fair Parties seek amendments to finding of fact 133 to reflect that DHEC found that it was mistaken in its determination that the Holcombe and Fair Parties never implemented a stormwater plan and rescinded the $1000 fine; or to remove any reference to the fine. Factual finding 133 states:

44

> In early to mid-1999, DHEC inspected the Site to examine the storm[]water management features in place. [PCS Ex. 145]. DHEC concluded that Seabrook's original storm[]water management plan was never implemented. [PCS Ex. 145]. DHEC fined Holcombe and Fair $1,000 for "non-compliance with the original approvals from OCRM." [PCS Ex. 146].

[Entry 563 ¶ 133]. The record reflects that the rescission of the fine was at least considered by DHEC. Pursuant to Rule 52(b), the court will amend its factual finding to reflect this. [*See* Holcombe and Fair Parties Ex. 14; PCS Exs. 145, 146 and 148]. However, because the record indicates that the Holcombe and Fair Parties did not fully implement the stormwater retention plan approved by DHEC, [*see* PCS Ex. 148 at 2; Entry 563 ¶ 127-129], the court concludes that the portion of harm allocated to the Holcombe and Fair Parties should remain the same.

The Holcombe and Fair Parties ask the court to reconsider its holding that the Holcombe and Fair Parties are liable for a disposal at the Site. [Entry 570 at 8]. The Holcombe and Fair Parties contend that instead of relying on *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489 (11th Cir. 1996), the court should rely on *HRW Systems, Inc. v. Washington Gas Light Co*., 823 F. Supp. 318 (D. Md. 1993) in its analysis. The Holcombe and Fair Parties also argue that any movement of soil during the construction of the road and utilities extensions did not add any new contaminants to the Site, did not increase the volume of contaminants at the Site, and only caused a minor, localized redistribution of soils. [Entry 570 at 12]. The Holcombe and Fair Parties contend that holding them liable for remediation costs is unjust. [*Id.*]. RHCE adopts the Holcombe and Fair Parties' argument that any soil movement did not increase the volume of contaminants at the Site. [Entry 585 at 5].

The court declines to reconsider its finding that the Holcombe and Fair Parties' earth moving activities caused the disposal of hazardous wastes on the Site. Neither *Redwing* nor *HRW Systems*

is binding precedent, which means that the court may follow which ever case it deems more persuasive to the extent that neither case is inconsistent with binding precedent. After reviewing the applicable case law, the court concludes that its reliance on *Redwing* for the proposition that "a 'disposal' may occur when a party disperses contaminated soil during the course of grading and filling a construction site," *Redwing*, 94 F.3d at 1511-12, is consistent with Fourth Circuit precedent. In *Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837 (4th Cir. 1992), the Fourth Circuit recognized that a "disposal" could involve merely passive conduct. *Id.* at 846. The Fourth Circuit specifically stated that "Congress intended the 42 U.S.C. § 6903(3) definition of disposal 'to have a range of meanings,' including not only active conduct, but also the reposing of hazardous waste and its subsequent movement through the environment." *Id.* at 845 (citing *United States v. Waste Indus., Inc.*, 734 F.2d 159, 164 (4th Cir. 1984)). The court's finding that the Holcombe and Fair Parties' actions in developing the Site, which included grading and excavation activities, constituted a disposal was thus appropriate. In addition, the court's determination that these activities contributed to the extent of contamination at the Site is supported by the record. [*See* Trial Tr. 2070:20-24 (Grip testimony based upon aerial photography that the Holcombe and Fair Parties' excavation and grading activities caused an "intense disturbance" at the Site); 1587:9-15 (Murphy testifying that the distribution of contamination across the Site is driving the remedy); 1943:11-15 (Murphy agreeing that the fact that contamination was mixed up with clean soil increased the volume of soil that had to be removed); 791:7-18 (Freeman testifying that man-made activities can redistribute contamination)].

By way of conclusion, the court notes that the Holcombe and Fair Parties' argument that holding them liable for remediation costs is unjust is inconsistent with CERCLA's strict liability

46

2:05-cv-02782-MBS    Date Filed 05/27/11    Entry Number 626    Page 47 of 50

emphasis. *See Nurad*, 966 F.2d at 846 ("The district court's view of the CERCLA definition of disposal is also at odds with CERCLA's strict liability emphasis. The trigger to liability under § 9607(a)(2) is ownership or operation of a facility at the time of disposal, not culpability or responsibility for the contamination."). The court's allocation of a portion of the remediation costs to the Holcombe and Fair Parties is consistent with CERCLA. The court has again considered its allocation of liability to the Holcombe and Fair Parties, and concludes that its original allocation of liability was appropriate.

**VI.    RHCE's Motion to Alter or Amend the Judgment**

RHCE contends that the record does not support the court's finding that RHCE is liable as an "operator" under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a). [Entry 568 at 1-2]. Thus, RHCE disagrees with the court's analysis of the *Bestfoods* decision as applied to CERCLA § 107(a)(1), and the court's determination that RHCE's earth moving activities constituted a disposal on the Site. [Entry 568 at 5-7]. The court has reviewed RHCE's arguments and citations to the record, but declines to alter its conclusion that RHCE is liable under CERCLA as an operator.

RHCE also contends that its parcel is not part of the Site at issue and does not need to be remediated. Entry 568 at 2, 3-4, 8. The court disagrees. The district court in the *Burlington Northern* case addressed a similar argument. The district court in *Burlington Northern* noted that courts "do not necessarily defer to a defendant's suggestion as to the scope of a CERCLA facility, because a defendant will . . . define the facility narrowly to avoid liability. *Atchison*, 2003 WL 25518047, at *47 (citing cases); *see also Clear Lake Props. v. Rockwell Int'l Corp.*, 959 F. Supp. 763, 768 (S.D. Tex. 1997); *United States v. Stringfellow*, 661 F. Supp. 1053, 1059 (C.D. Cal. 1987). The district court in *Burlington Northern* also stated it is more appropriate to defer to a plaintiff's

definition of a facility because "the plaintiff is the master of its claim and should be allowed to allege or conceptualize the facility in any manner to suit liability, as long as the asserted definition falls within the very broad statutory definition." *Id.* at *47. In addition, the district court in *Burlington Northern* noted that applying the definition of a facility expansively furthers the remedial goals of CERCLA. *Id.*

Other courts have determined the scope of a CERCLA facility based upon such factors as the scope of response actions, the EPA's determination of which land is included in a facility, and where hazardous substances have been disposed of. *See e.g. United States v. Ne. Pharm. & Chem. Co.*, 810 F.2d 726, 743 (8th Cir. 1986) (location where hazardous substances were disposed of and where government concentrated cleanup efforts was facility); *United States v. Ottati & Goss*, 694 F. Supp. 977, 984 (D.N.H.1988) (Listing of two sites on the National Priorities List for unified response action determined facility); *Akzo Coatings Inc. v. Aigner Corp.*, 960 F. Supp. 1354, 1358-59 (N.D. Ind.1996)(noncontiguous areas were one facility because the EPA treated them as such).

The court concludes that the RHCE parcel is part of the Site. Ashley's allegations in the complaint included the RHCE parcel as part of the Site. [Entry 209 ¶ 21]. In addition, EPA's investigations of the Site included investigation of the RHCE parcel. [PCS Exs. 216 at A 00858, 226 at Figs 2-1, 2-2]. As the court noted in its order and opinion, CERCLA affords EPA the authority to create and adopt a remediation plan. *See* 42 U.S.C. § 9617. The record in this case makes clear that EPA intends for the RHCE parcel to be remediated because EPA's proposed remediation plan includes remediation of the RHCE parcel. [PCS Ex. 120 at 3; PCS Ex. 226 at PCS002_002580-81; PCS Ex. 227 at A 00287, A 00292, Fig 3-3a & 3-4a]. Therefore, the court declines to revisit its determination that the RHCE parcel is part of the Site and requires remediation.

RHCE also contends that there is no record evidence that any of the past CERCLA response costs incurred by Ashley prior to this suit were spent on the RHCE parcel and that therefore, the court's calculation of past response costs attributable to RHCE is without any evidentiary basis. [Entry 568 at 3].   This contention is without merit.  By way of example, Ashley's past response costs included approximately $50,000 paid to Entact to develop plans to implement EPA's preferred remedy for soil and sediment contamination, including at the RHCE parcel. [Ash. Exs. 247 at A01_07603, 252 at A0107607,  194 at A04_04879, 885-86].

## VII.   Allocation

The parties have also brought to the court's attention that the conclusion in its order and opinion was inconsistent with the court's finding that PCS is jointly and severally liable to Ashley for all of the harm at the Site, less applicable set-offs, and that Ross and RHCE are liable to PCS in contribution.  The second amended order and opinion has been amended accordingly.  Because an orphan share has not yet been established, PCS's joint and several liability will include Ross's entire allocated portion.

## CONCLUSION

Based upon the foregoing, 1) Ashley's motion to amend the judgment (Entry 572) is **granted in part and denied in part**; 2) PCS's motion for reconsideration and clarification (Entry 569) is **granted in part and denied in part**; 3) Ross's motion to amend or modify findings of fact and conclusions of law (Entry 567) is **granted in part and denied in part**; 4) The Holcombe and Fair Parties' motion to amend (Entry 570) is **granted in part and denied in part**; and 5) RHCE's motion to alter or amend the judgment (Entry 568) is **granted in part and denied in part**.  The court is issuing a second amended order and opinion contemporaneously herewith, which reflects the court's

rulings on the above motions.

**IT IS SO ORDERED.**

s/ Margaret B. Seymour
The Honorable Margaret B. Seymour
United States District Judge

May 27, 2011
Columbia, South Carolina