# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION

| | |
|---|---|
| Ashley II of Charleston, L.L.C., ) | |
| ) | Civil Action No. 2:05-2782-MBS |
| Plaintiff, ) | |
| ) | |
| vs. ) | **ORDER AND OPINION** |
| ) | |
| PCS Nitrogen, Inc., ) | |
| ) | |
| Defendant/Third-Party Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| Ross Development Corporation; ) | |
| Koninklijke DSM N.V.; DSM Chemicals ) | |
| of North America, Inc.; James H. ) | |
| Holcombe; J. Holcombe Enterprises, L.P.; ) | |
| J. Henry Fair, Jr.; Allwaste Tank Cleaning, ) | |
| Inc.; Robin Hood Container Express; and ) | |
| the City of Charleston, ) | |
| ) | |
| Third-Party Defendants. ) | |
| _____) | |

This matter is before the court for the final determination of the damages due PCS Nitrogen, Inc. ("PCS") under its indemnity contract with Ross Development Corporation ("Ross").

## I. Factual and Procedural Background

### A. The Underlying CERCLA Action

On July 16, 2008, Ashley II of Charleston, L.L.C. ("Ashley") filed an amended complaint against PCS seeking a declaration of joint and several liability under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") § 107 for environmental response costs at the Columbia Nitrogen Site in Charleston, South Carolina (the "Site"). ECF No. 209. Ashley also sought damages based on past response costs. *Id.* On August 4, 2008, PCS filed

1

an amended answer and counterclaim. ECF No. 226. PCS asserted contribution claims under CERCLA § 113(f) against Ashley; Ross; Koninklijke DSM N.V. and DSM Chemicals of North America, Inc.; James H. Holcombe; J. Holcombe Enterprises, L.P.; J. Henry Fair, Jr.; Allwaste Tank Cleaning; Robin Hood Container Express, Inc.; and the City of Charleston, South Carolina, alleging that they were potentially responsible parties ("PRPs"). *Id.* PCS also asserted a claim against Ross for indemnification based on contract. *Id.*

On May 27, 2011, after a bench trial, the court issued a Second Amended Order in which a detailed recitation of the facts of this case can be found. ECF No. 627. The following findings of fact are pertinent here. Ross was formerly known as Planters Fertilizer & Phosphate Company ("Planters") and PCS is the successor-in-interest to Columbia Nitrogen Corporation ("CNC").[1] *Id.* at 3 & 9. Ross owned the Site from 1906 to 1966 and operated a phosphate fertilizer manufacturing facility on the Site during this time. *Id.* at 9. Ross's activities generated pyrite slag as a waste product, which is the source of a vast majority of the arsenic and much of the lead contamination at the site, as well as the high acidity. *Id.* at 12.

In 1966, Ross sold the Site to PCS. *Id.* at 14-15. The agreement to sell the Site included an indemnification provision stating:

> [Ross] agrees to indemnify and hold harmless [PCS] in respect to all acts, suits, demands, assessments, pr[o]ce[e]dings and cost and expenses resulting from any acts or omission[s] of [Ross] occurring prior to the closing date and pertaining herein, provided [Ross] receives prompt notice in writing of such claims or demand and [Ross] shall have the right to litigate or contest such claim.

---

[1] Ross and Planters are collectively referred to as "Ross," and PCS and CNC are collectively referred to as "PCS."

2

*Id.* at 14. PCS owned the Site from 1966 to 1985 and operated a fertilizer granulation plant on the Site between 1966 and 1972, as well as an acid plant between 1966 and 1970. *Id.* at 9 & 17. PCS's activities caused arsenic, lead, and acid contamination at the Site. *Id.* at 17-19. Also, between 1971 and 1981, PCS performed various demolition activities on the Site that significantly disturbed the contaminated soils. *Id.* at 21-23.

In the Second Amended Order, the court held that PCS is jointly and severally liable for the harm, and that PCS is liable to Ashley for response costs pursuant to CERCLA § 107(a)(2). *Id.* at 121. In making this finding, the court considered and rejected PCS's divisibility defense: five methods proposed by PCS which PCS argued would allow the court to apportion the harm attributable to the various parties. *See generally id*. at 74-90. The court rejected each of PCS's proposed methods and concluded that the record provided no reasonable basis for apportioning the harm at the Site, and that, therefore, the harm at the Site was indivisible. *Id*. at 90 (citing *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 614 (2009)). Accordingly, the court found PCS to be jointly and severally liable pursuant to § 107(a)(2).

The court directed entry of judgment for Ashley in the amount of $147,617.02 plus interest against PCS and declared that PCS would be liable to Ashley for 76 percent of future response costs. *Id.* PCS, however, succeeded in contribution claims pursuant to § 113(f) against the third-party defendants. The court directed entry of judgment for PCS in the amount of $87,404.82 plus interest against Ross. *Id.* Relevant here, the court declared that Ross would be liable to PCS for 45 percent of future response costs. *Id.* Finally, the court declared that PCS is entitled to reimbursement from Ross pursuant to the indemnification contract. *Id.* A Second Amended Judgment was entered on May 31, 2011. ECF No. 628.

The parties appealed, seeking reversal of this court's determinations. Among the many issued on appeal was the issue of whether this court erred in holding PCS jointly and severally liable rather than accepting its divisibility defense and apportioning the harm at the Site. *See generally* ECF No. 720. On April 10, 2013, the Fourth Circuit affirmed. *Id*.

### B. PCS's Indemnification Claim

Relating specifically to the issue of indemnity damages under the indemnity contract, PCS filed a motion on June 14, 2011, for a determination of damages, requesting that the court establish a procedure to determine the amount owed by Ross to PCS under the terms of an indemnity contract. ECF No. 631. On February 24, 2012, the court issued an order holding that PCS was entitled to recover from Ross forty-five percent of the attorney's fees, costs, and expenses that PCS spent litigating this case. ECF No. 692. On January 15, 2013, the court issued an order vacating in part the February 2012 order. ECF No. 705. The court held a status conference on February 4, 2013, at which the parties agreed to submit supplemental briefing to assist the court in delineating which of PCS's litigation costs and expenses are covered under the terms of the indemnity contract. *See* ECF Nos. 710, 715 & 722.

Upon review, it appeared to the court that a potentially novel question of state law could be dispositive of the issues remaining in this case. Pursuant to South Carolina Rule of Appellate Procedure 244, this court certified a question to the South Carolina Supreme Court on August 19, 2013. ECF No. 749. The certified question was:

> Does the rule that a contract of indemnity will not be construed to indemnify the indemnitee against losses resulting from its own negligent acts, unless such intention is expressed in clear and unequivocal terms, apply when the indemnitee seeks contractual indemnification for costs and expenses resulting in part from its own strict liability acts?

4

The South Carolina Supreme Court accepted the certified question and heard arguments on March 4, 2013.

The South Carolina Supreme Court issued its opinion on July 23, 2014. ECF No. 770. The South Carolina Supreme Court answered the certified question "no," thereby permitting PCS's indemnification claim against Ross. *Id.* at 1. The South Carolina Supreme Court went on to state that "the indemnification agreement was limited to any liability attributable to Ross up to the date of the 1966 closing . . . . The agreement did not permit indemnification from Ross for any liability (by way of negligence, strict liability or otherwise) after the 1966 closing." *Id*. at 5. The South Carolina Supreme Court denied a petition for rehearing on September 25, 2014.

By way of text order entered on September 30, 2014, the parties were directed to submit short briefs on the effect of the decision of the South Carolina Supreme Court on the indemnification question pending before this court. ECF No. 789. The parties submitted briefs as directed on October 10, 2014. *See* ECF Nos. 793 & 794. On November 18, 2014, the court issued a final order governing the calculation of damages. ECF No. 796. In that order, the court held that PCS "may recover from Ross any of its litigation expenses defending the claims brought against it by Ashley which PCS can prove are associated with liability incurred because of Ross's pre-1966 conduct." *Id*. at 5. The court further held that the costs and expenses PCS incurred litigating its contribution claim against Ross were unrecoverable. *Id*. at 6. However, where a cost was reasonably incurred in furtherance of both PCS's defense against Ashley II, an indemnified claim, and a contribution claim, an non-indemnified claim, PCS may recover the cost from Ross. *Id*. at 7.

### C.  The Evidentiary Hearing on Indemnity Damages

In keeping with the court's determination that PCS was required to prove its damages under the indemnification contract, the court held an evidentiary hearing on the issue of damages. PCS submitted its brief quantifying its damages on January 20, 2015. ECF No. 814. Ross filed a response in opposition on March 18, 2015. ECF No. 827. The court held an evidentiary hearing lasting several hours on April 8, 2015. ECF No. 828. At the evidentiary hearing, one witness testified: John B. Williams ("Williams"), counsel for PCS. *See* ECF No. 830. The parties also submitted various exhibits, including voluminous billing records and copies of assorted documents in this litigation, including copies of briefing, complaints, answers, and court orders and opinions. *See* ECF No. 829.

PCS claims a total of $1,104,557.20 in indemnifiable legal costs, fees, and expenses. ECF No. 814-1 at 10. Williams explained the calculation of this figure as breaking down into three "buckets," ECF No. 830 at 33:23-35:1, as follows:

1) The investigation of Ross's operations at the Site
2) The deposition of Olinn Carter, a former employee of both Planters and CNC
3) "Further development of the facts and the law with respect to [PCS's] divisibility defense," *id*. at 35:22-25.

For the first category, the investigation of Ross's operations, PCS seeks to recover 100 percent of the costs it incurred, i.e., $57,721.17. For the second category, the Carter Deposition, PCS seeks to recover 50 percent of the costs it incurred because Carter worked for both Planters and CNC and so testified as to the operations on the Site both before and after 1966. *Id*. at 37:14-38:3. For the third category, PCS seeks to recover 40 percent of the costs it incurred, totaling the remainder of the damages claimed. *See* ECF No. 814-1 at 2-6; ECF No. 830 at 38:15-39:15. PCS breaks this third "bucket" into several categories:

| | |
|---|---|
| Expert Discovery | $66,034.97 |
| Trial Preparation | $206,728.66 |
| Expert Trial Testimony | $87,511.47 |
| Findings of Fact & Conclusions of Law | $116,006.37 |
| Rule 59 Motions | $25,731.67 |
| Appeal | $309,734.56 |
| Expert Costs | $226,205.47 |

ECF No. 814-1 at 10. Williams called his 40 percent calculation "generous towards Ross." ECF No. 830 at 39:10-11.

Ross launches a multi-pronged attack on PCS's damages claim. Ross first argues that PCS is not entitled to any of its claimed expenses because they were related to Ross's pre-1966 conduct and because they were not incurred in the defense of Ashley II's § 107(a) CERCLA claim. Rather, Ross contends that all of the claimed expenses were related either to (1) PCS's own post-1966 conduct instead of Ross's pre-1966 conduct as part of PCS's divisibility defense, or (2) related to the prosecution of PCS's third-party CERCLA § 113(f) contribution claim against Ross. Ross's second position is that—even if some of the claimed costs are related to Ross's pre-1966 conduct and were incurred in defense of Ashley II's claim—Williams's 40 percent calculation of the third "bucket" is deeply problematic and lacking sufficient detail to meet PCS's burden of proving its expenses by a preponderance of the evidence. Ross's third and final contention is that to the extent the court deems PCS as having proved an amount of indemnifiable expenses, the amount of fees sought by PCS is unreasonable because of PCS's use of block billing, billing for clerical tasks, and billing for duplicative tasks. The court considers each of these objections in turn below.

## II. Indemnifiability of PCS's Divisibility Defense

As noted above, Ross's foremost position is that none of PCS's claimed expenses are recoverable under the terms of the indemnity contract. Ross points first to Ashley's initial complaint

against PCS. ECF No. 1 (Ross Ex. 15). That complaint mentioned only PCS's post-1966 conduct and never asserted a CERCLA claim against PCS specifically for any acts attributed to Ross. *Id*. Ross contends that because Ashley never alleged any liability against PCS based on Ross's pre-1966 conduct, none of the expenses PCS incurred defending Ashley's claim resulted from Ross's pre-1966 conduct. *See* ECF No. 827 at 7-9. Ross also objects to being made to pay any costs associated with PCS's divisibility defense because "the divisibility defense was PCS's effort to distance PCS from all the other PRPs, not just Ross, by focusing on PCS's post-closing conduct alone." *Id*. at 9. Relatedly, Ross argues that the other claimed fees were incurred to further only PCS's third-party CERCLA § 113(f) contribution claim against Ross: "PCS does not attribute any of the time it spent developing the record as to Planters' operations to the prosecution of its Third-Party Complaint, when in fact all of its investigation of Planters' site operations was in support of the Third-Party Complaint." *Id*. at 10.

The fate of this argument—and, accordingly, the fate of Ross's position that PCS is entitled to none of its claimed expenses—hinges on the characterization of PCS's divisibility defense. If PCS's divisibility defense is unrelated to Ross's pre-1966 conduct and focuses instead entirely on PCS's *own* post-1966 conduct, then PCS cannot be compensated for the costs it incurred developing the divisibility defense. If, however, the divisibility defense involved not only proof of PCS's post-1966 conduct, but also proof of pre-1966 conduct related to Ross, as a necessary part of establishing that the harm at the Site was indeed divisible among the PRPs, then the costs related to proof of Ross's conduct prior to 1966 are properly indemnifiable. Ross would have the court hold all evidence of Ross's pre-1966 conduct totally unrelated to the divisibility defense and, instead, relevant solely to PCS's § 113(f) contribution claim.

The divisibility defense, the mechanics of its operation, and its applicability to the facts of this case have been extensively discussed before both by this court, *see, e.g.*, ECF No. 627 at 74-90, and by the Fourth Circuit Court of Appeals, ECF No. 720. In brief review, the default position when a party brings a claim pursuant to CERCLA § 107(a) is that a defendant's liability is joint and several. *United States v. Monsanto Co.*, 858 F.2d 160, 171 (4th Cir. 1988). A defendant, however, may escape joint and several liability by establishing that the harm is divisible and by providing a reasonable basis for apportioning harm at a site among the various PRPs. *Burlington N. and Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 614 (2009). The so-called "divisibility defense" and its concomitant apportionment analysis are indisputably a defense to a CERCLA § 107(a) claim.

The divisibility defense is separate and distinct from the equitable considerations that come into play in any contribution action that may be brought pursuant to CERCLA § 113(f). *Id*. at 615 n. 9 (quoting *United States v. Burlington N. & Santa Fe Ry. Co.*, 520 F.3d 918, 939 (9th Cir. 2007)) ("Equitable considerations play no role in the apportionment analysis; rather, apportionment is proper only when the evidence supports the divisibility of the damages jointly caused by the PRPs . . . . '[a]pportionment . . . looks to whether defendants may avoid joint and several liability by establishing a fixed amount of damage for which they are liable,' while contribution actions allow jointly and severally liable PRPs to recover from each other on the basis of equitable considerations."). *Burlington Northern* makes clear that the divisibility defense is uniquely linked to a CERCLA § 107(a) claim. The apportionment of harm associated with a divisibility defense is unconnected, as a conceptual matter, to the equitable allocation a court may also undertake in a related contribution action pursuant to CERCLA § 113(f). It may be, of course, that the evidence used to advance an apportionment pursuant to an asserted divisibility defense is similar to, or even

9

identical to, the evidence used to determine an equitable allocation of response costs in a contemporaneous § 113(f) contribution action. In this case, featuring both a § 107(a) claim and § 113(f) contribution counterclaims, there is no reason to disregard the fact that PCS vigorously pursued the divisibility defense and was required, as part of that defense, to put on considerable evidence of Ross's pre-1966 conduct in order to try to distinguish the harm caused by Planters from that caused by CNC.[2]

PCS asserted a divisibility defense in response to Ashley's CERCLA § 107(a) claim. As part of that defense, PCS necessarily developed evidence of Ross's pre-1966 conduct. That the court rejected PCS's divisibility defense and instead went on to use much of the same evidence to equitably apportion liability for response costs at the Site pursuant to PCS's third-party CERCLA § 113(f) contribution claim is of no moment. PCS is not, of course, entitled to indemnity for all of the costs associated with its divisibility defense. Rather, only costs which PCS's incurred in an

---

[2] In response to a question by the court at the evidentiary hearing about the exact relationship of Ross's operations to PCS's divisibility defense as opposed to PCS's contribution counterclaim, Williams testified that:

> As a matter of proof, it is virtually very difficult, I won't say impossible, but very difficult, almost impossible, to separate it out because it relates to the same proof. It relates to how much pyrite, how much lead, what the pH was, that – conditions caused by Ross, that same proof was necessary to show our contribution claim and to prove our divisibility defense because we had to determine the amount of contaminants that were put there by Ross. So it's quite the same.

ECF No. 830 at 126:19-127:2. The court agrees that the evidence in this case about Ross's pre-1966 operations was just as necessary to PCS's divisibility defense as it was to PCS's contribution counterclaim. Expenses incurred in putting on that evidence are, therefore, recoverable under the indemnity contract.

attempt to apportion harm at the Site as part of its divisibility defense and which were related to Ross's pre-1966 conduct are recoverable under the indemnity contract.

### III. PCS's Proof of Damages

Having concluded that costs associated with PCS's divisibility defense are properly indemnifiable, the court must next determine whether PCS met its burden of proof and established the damages it is due under the contract, i.e., that the costs, fees, and expenses it claims were associated with Ross's pre-1966 conduct. The court, therefore, examines each of the three "buckets" of costs sought by PCS to determine if they are associated with Ross's pre-1966 conduct.

#### A. Investigation of Ross Operations

PCS seeks indemnification for 100 percent of the $57,721.17 in costs it claims it incurred to investigate Ross' operations at the Site. The court has reviewed the particular entries in the billing records submitted by PCS in this "bucket." Several are clearly indemnifiable, such as those for "research and review [of] publically available documents on phosphate fertilizer production at the Planters's Columbia Nitrogen site, as potential sources of evidence that would support divisibility argument." PCS Ex. 1 (entries for S. Kaczmarczyk on 11/18/07, 2/27/08, 2/28/08, and 2/29/08). All of the claimed costs for all time keepers in this "bucket" before June 1, 2008, are related to the investigation of the operations of Planters and are, therefore, recoverable in their entirety. *See* 814-1 at 11-13; PCS Ex.1; PCS Ex. 4.

Many of the entries in this "bucket," however, relate to PCS's attempt to discover EPA reports about the Site and to depose EPA project manager Craig Zeller ("Zeller"). Indeed, the majority of time entries in this bucket relate to PCS's effort to obtain testimony by Zeller. Williams

11

testified on direct examination at the evidentiary hearing about the motivation behind the pursuit of Zeller's testimony:

> Mr. Zeller, who was an EPA official . . . had made a statement that . . . the lead acid chambers [such as those used by CNC] were the most relevant feature related to contamination. And we contested that statement significantly . . . because that would have minimized the role of pyrite [attributable to Planters] in this litigation.

ECF No. 830 at 36:20-37:5. On cross-examination, Williams further explained that Zeller's "statement by omitting pyrite was inaccurate. And it was the omission of the reference that required us to take some action." *Id*. at 124:2-12. It is clear from this testimony that the Zeller testimony would include information about all of the Site owners, including Ross, but would also, at a minimum, involve substantial discussion of PCS's own post-1966 operations at the Site.

The court concludes that PCS is not entitled to indemnity for 100 percent of the costs associated with the testimony of Zeller. PCS may properly be indemnified for 70 percent of the costs it seeks in this first "bucket," which represents a discount applied to those costs incurred in pursuit of Zeller's testimony because that testimony would have substantially involved PCS's own post-1966 conduct in addition to any testimony bearing on Ross's pre-1966 conduct. The court, therefore, finds that PCS is entitled to indemnification for the costs claimed in this first "bucket" in the amount of $40,404.82.

### B. Olinn Carter Deposition

Olinn Carter was an employee who worked for both Planters and CNC, and his testimony related to the operations of both entities at the Site. The court has reviewed the billing records related to his deposition and has determined that PCS is entitled to indemnification, as it claims, for

50 percent of the costs it incurred in deposing Olinn Carter. The court, therefore, finds that PCS is entitled all of the costs included in the second "bucket" in the amount of $8,882.87.

### C. Trial and Post-Trial Expenses

The third, and largest, of the "buckets" claimed by PCS are those costs it incurred preparing for, during, and after trial. PCS seeks to recover 40 percent of the total costs it incurred during these phases. The specific tasks include expert discovery, trial preparation, expert trial testimony, preparation of proposed findings of fact and conclusions of law, Rule 59 motions, appeal, and expert costs. Ross attacks the calculations by Williams of the percentage of costs attributable to Ross's pre-1966 conduct as "pure speculation." ECF No. 827 at 14. Ross points out that PCS offers only Williams's "opinion" to support its claim. Ross rejects the approach of applying a flat percentage to categories of costs and fees because it is, Ross argues, insufficient "to prove" that certain fees were incurred because of Ross's pre-1966 conduct.

At the evidentiary hearing, Williams explained how he settled on the 40 percent multiplier. It was a two-step process. According to Williams: "Initially what I did is that I took a look at the bills and came up with my understanding of the time in a general fashion that we had spent dealing with each of the other parties in the case. And . . . I thought 50 percent was attributable to Ross, but then I took out the issues that did not relate to pre-1966 conduct. So the 40 percent I thought was a good determinant of the pre-'66 conduct  . . . ." ECF No. 830 at 125:10-20.

This initial review was insufficiently granular and was methodologically unsound, based only on Williams's "understanding," "recollection," and "work for a number of years" on the case. *Id*. at 75:3-5. Williams, however, "subsequently confirmed that [40 percent] number," *id*. at 125:21, at a later point in time when he was "getting ready for the deposition [by Ross's counsel]" in order

13

to be able "to point to some sort of empirical basis [for the 40 percent figure]," *id*. at 75:5-7.   This later review included an examination of the length at which the various experts involved in the case discussed Ross's pre-1966 operations in their reports, PCS's proposed findings of fact and conclusions of law, and reviewing the trial transcript of various witnesses and the closing arguments in the case.  *Id*. at 39:16-41:13.  Williams testified that the amount of time or pages dedicated to pyrite and to Ross's allocation under the divisibility defense in these various documents was between 40 and 80 percent.  *Id*.  PCS did not simply submit for indemnification a flat 40 percent of its total litigation costs for the entire action.  Rather, PCS "applied the 40 percent only to certain time all the way through. And we also took out hunks of time and timekeepers that were not working on things that we clearly felt were clearly attributable to Ross [and also removed] generic time entries."  *Id*. at 43:17-22.

The court has reviewed the billing records submitted by PCS and has determined that the costs sought by PCS relating to expert discovery, trial preparation, the findings of fact and conclusions of law, the Rule 59 motions, and expert costs are attributable to Ross's pre-1966 conduct in that they advanced PCS's divisibility defense by attempting to establish the effect of Ross's pre-1966 actions on the Site.  The court also concludes that William's methodology on his second review of the billing records for arriving at the 40 percent figure reasonably approximates the amount of time and effort spent by PCS to establish the contamination at the Site attributable to Ross and to seek a determination from the court that the harm at the Site was divisible. Accordingly, the court finds that the costs sought by Ross in those categories, totaling $728,218.61, is covered under the indemnity contract.

PCS also seeks 40 percent of the costs of its appeal, totaling $309,734.56.  The court's

14

review of the briefs submitted to the Fourth Circuit by PCS and the opinion of the Fourth Circuit, Ross Exs. 34 & 35, ECF No. 720 (Ross Ex. 36), reveals that the divisibility defense related to Ross constituted less than 40 percent of the issues considered on appeal. PCS is not, therefore, entitled to indemnity for 40 percent of its appellate costs. The court finds a more accurate figure to be 20 percent, which takes into account the fact that in addition to divisibility, the issues on appeal included PCS's successor liability, a bona fide prospective purchaser defense, the status of the parties as PRPs, and the court's ultimate equitable allocation of response costs. The court therefore finds that PCS is entitled to indemnity for a total of $154,867.28 of its appellate costs. In sum, of those costs claimed in PCS's third "bucket," PCS is entitled to indemnification in the amount of $883,085.89.

The court concludes that the total amount of costs, fees, and expenses which PCS proved were associated with Ross's pre-1966 conduct and which PCS incurred pursuing its divisibility defense to Ashley's CERCLA § 107(a) claim is $932,373.58.

## IV.  Reasonableness Analysis

After determining the amount of litigation expenses PCS incurred that is attributable to Ross's pre-1966 conduct, the court, as a final safeguard, undertakes a review of the reasonableness of the claimed expenses. In assessing the reasonableness of the fees, South Carolina courts consider six factors:

> 1) The nature, extent, and difficulty of the legal services rendered
> 2) Time and labor necessarily devoted to the case
> 3) The professional standing of counsel
> 4) The contingency of compensation
> 5) The fee customarily charged in the locality for similar services
> 6) Beneficial results obtained

*Blumberg v. Nealco*, 427 S.E.2d 659, 660 (S.C. 1993); *Dedes v. Strickland*, 414 S.E.2d 134, 137 (S.C. 1992). PCS and Ross do not dispute the reasonableness of the fees claimed on the basis of the first, and third through sixth factors. The parties agree that the issues involved in this case and the legal services rendered were extensive and difficult, that the counsel for PCS are of good professional standing, that the fee award at Washington, D.C., ("D.C.") rates for the D.C.-based attorneys is reasonable, and that PCS's counsel obtained beneficial results for their client. PCS's submission contains biographies of the counsel who worked on the case as well as justification for the use of D.C. counsel. *See* ECF No. 814-3. The court has reviewed these biographies, the affidavits of counsel, and the expert report submitted by PCS. The court is satisfied that the fees PCS claims are reasonable as to the first, third, fourth, fifth, and sixth *Dedes* factors. What remains at issue, however, is the time and labor necessarily devoted to the case. Ross critiques the use of block billing by PCS, its billing for clerical tasks, and its billing for duplicative tasks.

"The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). Certain billing practices are disfavored as they make it difficult to determine whether the time expended on a given task was reasonable, or, in other words, "necessarily devoted to the case." Block billing is one of these disfavored practices, and a fee award may be reduced to reflect the use of block billing. Block billing occurs when attorneys "lump[ ] tasks together in time entries rather than making such entries task-by-task." *McAfee v. Boczar*, 738 F.3d 81, 90 (4th Cir. 2013) (affirming a district court's reduction of the number of hours claimed by two attorneys by ten percent each to reflect the ambiguities inherent in block billing). PCS's fee request contains many examples of block billing:

16

- On March 3, 2008, W. Howell Morrison billed 8 hours for "Columbia Nitrogen Site core testing and split sample issues, Various telephone conferences with R. Young and B. Hagood per Mr. Lynch; Strategy and discovery planning meeting with Messers. Lynch and Williams and Ms. Kaczmarcyzk; Telephone conferences with title searcher; Telephone conference with R. Young."

- On September 24, 2009, J.B. Williams billed 6 hours for "call with Tim Bouch; preparation of demonstratives; review Hutto report; pretrial preparation; work on pretrial statement; review correspondence from Rutledge Young; conference calls with experts."

- On September 28, 2009, W. Glaxton billed 8.75 hours for "drafting pretrial brief; reviewing trial exhibits; planning logistics of trial; researching law regarding lessor/lessee liability under CERCLA."

- On January 21, 2010, W. Glaxton billed 5.5 hours for "Preparing for trial in Columbia; drafting witness outlines, reviewing exhibits to be used in cross examinations; working with expert witnesses; reviewing trial transcripts."

- On February 15, 2012, C.J. Chosiad billed 7.5 hours for "CERCLA: Review outline; research case law regarding divisibility of harm; meet with J. Swize to discuss legal theories; work with A. Clair and T. Polkson to create research binders."

PCS Exs. 1 & 4. This block billing "frustrates the court's effort to apportion fees." *Uhlig, LLC v. Shirley*, 895 F. Supp. 2d 707, 714-15 (D.S.C. 2012) (reducing fees claimed by sixty percent to reflect, in part, the use of block billing); *see also First S. Bank v. Fifth Third Bank, N.A.*, No. CIV. A. 7:10-2097-MGL, 2014 WL 3868000, at *5 (D.S.C. Aug. 6, 2014) (reducing fees awarded for a deposition by fifty percent to reflect the ambiguity introduced by block billing).

In addition to block billing, a second disfavored billing practice is the use of quarter-hour time increments. *See Broyles v. Dir., Office of Workers' Comp. Programs*, 974 F.2d 508, 510-11 (4th Cir. 1992) ("[w]e are also concerned by [an attorney's] hourly [fee] claim which never lists anything less than 15 minutes); *but cf. E. Associated Coal Corp. v. Dir., Office of Workers' Comp. Programs,* 724 F.3d 561 (4th Cir. 2013) (refusing to *per se* disallow entries billed in quarter-hour

17

increments). In appropriate circumstances, a court may reduce a fee award for the use of quarter-hour billing to reflect the risk of over billing. *See Bd. of Educ. of Frederick Cnty. v. I.S. ex rel. Summer*, 358 F. Supp. 462, 470 (D. Md. 2005) (reducing a fee award by five percent because of quarter-hour billing increments); *In re Computer Learning Ctrs., Inc.*, 285 B.R. 191, 218-19 (Bankr. E.D. Va. 2002) (stating that "[a] quarter-hour unit generally overstates the actual time expended . . . " and reducing a fee award for professional services by five percent). Among the firms seeking a fee award in this case, Jones Day used quarter-hour billing increments. Jones Day was responsible for a considerable number of the total hours billed.

Among the fees PCS seeks are also a number for clerical tasks. Certainly, in a case of this length and complexity, clerical assistance is necessary and is properly indemnifiable under the contract. However, "purely clerical or secretarial tasks should not be billed at a paralegal rate, regardless of who performs them." *Missouri v. Jenkins by Agyei*, 491 U.S. 274, 288 n.10 (1989). Further, the amount of time spent on a clerical task must be reasonable. Several examples from the billing records submitted as part of PCS's fee application suffice to illustrate the court's concern with the billing of clerical tasks in the records PCS submitted:

- On September 22, 2009, E.M. Gurskis billed 6 hours to "Create PDF's of PCS Pre trial exhibits in preparation for distribution for counsel."

- On October 12-14, 2009, E.M. Gurskis spent a total of 10.75 hours "Put[ting] together binders and document sets for attorney review."

- On January 12, 2-1-, P.J. Fanning billed 1.5 hours simply for "ordering duplicate original deposition transcripts" for four witnesses.

- On January 15, 2010 E.M. Gurskis billed 7 hours to "Set up conference room and assist with technological set up."

PCS Ex. 1. These types of clerical tasks, billed at paralegal rates and undertaken at such length, justify a reduction in the fee award to PCS.

Finally, excessively vague task descriptions inhibit the court's reasonableness review and justify a percentage reduction in the fee awarded. *See, e.g.*, *In re Outsidewall Tire Litig.*, 52 F. Supp. 3d 777, 789 (E.D. Va. 2014) (reducing a fee award by 55 percent for vague task descriptions coupled with block billing); *Local 32B–32J, Serv. Emp. Int'l Union, AFL–CIO et al. v. Port Auth. of N.Y. and N.J.*, 180 F.R.D. 251, 253 (S.D.N.Y. 1998) ("the vague descriptions contained in many of the attorney time records" justified a "20% reduction in the amount" requested); *accord. Rum Creek Coal Sales, Inc v. Caperton*, 31 F.3d 169, 180 (4th Cir. 1994) ("We have frequently exhorted counsel to describe specifically the tasks performed, a practice which is especially necessary when we review an award in a case where the plaintiff has not prevailed on all the claims."). Examples of impermissibly vague time entries in the records submitted by PCS in support of it indemnification claim include:

- Multiple entries by J.B. Williams of up to 10 hours each for "Trial preparation." PCS Ex. 1.

- Multiple entries by E.M. Gurskis in December 2009 of up to three hours each to "Organize case files." PCS Ex. 1.

- Entries by J.B. Williams reading simply "Appellate brief" during March 2012. PCS Ex. 2.

The vagueness of the task descriptions on a number of the time entries, such as those mentioned above, militates in favor of a reduction in the amount of fees due PCS.

In sum, the court cannot conclude that each and every fee sought by PCS was "necessarily devoted to the case" because the records submitted by PCS contain block billing, billing in quarter-hour increments, billing for clerical tasks, and excessively vague task descriptions. In circumstances such as this, "courts must exercise sound judgment based on knowledge of the case and litigation experience to reduce the number of hours by an appropriate percentage." *In re Outsidewall Tire*

*Litig.*, 52 F. Supp. 3d at 789 (collecting cases in footnotes 15 and 16).  A careful review of the records submitted by PCS, together with the court's deep knowledge of this case, leads the court to conclude that a blanket reduction of 20 percent is appropriate to ensure the reasonableness of the fees claimed by PCS.

## V. Conclusion

Applying a twenty percent reduction to the indemnifiable total of $932,373.58 results in a final award to PCS of its costs, fees, and expenses in the amount of $745,898.86.  The clerk is hereby directed to enter judgment on PCS's contractual indemnification claim against Ross in favor of PCS in the amount of $745,898.86.

**IT IS SO ORDERED.**

s/ Margaret B. Seymour<br>
Margaret B. Seymour<br>
Senior United States District Judge

Columbia, S.C.
July 21, 2015